## No. 11,663.

## REED McLANE VS. HIS CREDITORS.

Labor tickets showing simply an amount of money and " in goods" will not support either a transfer of the claims of the laborer with subrogation to the merchant, or a payment with legal subrogation by the latter.

"Delivery" is one of the incidental obligations resulting from a contract of sale, while " acceptance" bears upon one of the essential elements leading up to the creation and formation of the contract itself, viz., *consent*.

When it was in contemplation of both parties to a contract of sale that the property should reach the vendee in Louisiana, and while there in his possession a portion of the price would be still unpaid, it is fair to presume, in the absence of express stipulation to the contrary, that the vendee should reserve right of final acceptance for a reasonable time after its receipt, and that both parties should contract with reference to the operation of the laws of Louisiana.

APPEAL from the Seventeenth Judicial District Court, Parish of St. Mary. *Allen, J.*

The District Court homologated and slightly amended the provisional account of T. D. Hine, syndic of the insolvent estate of Reed McLane. There are two appeals, one of which is aimed at that part of the judgment recognizing a vendor's privilege in favor of the Curtis & Co. Manufacturing Company on certain machinery, and the other at the decree amending the syndic's account by granting John A. O'Niell a laborer's privilege on the money resulting from the sale of a lot of shingles.

*D. Caffery & Son* for Curtis Manufacturing Company, Opponents, and the Syndic, Appellants.

*Philip H. Mentz* for John A. O'Niell, Coleman & Vinson *et als.*, Opponents and Appellants.

ON THE OPPOSITION OF JOHN A. O'NIELL.

The opinion of the court was delivered by

NICHOLLS, C. J.   The attorneys of the syndic and of the opponent entered into an agreement, in which, declaring that the tickets referred to in the opposition of John A. O'Niell were all alike except as to amounts or sums named in them—the said sums being five cents, ten cents, twenty-five cents, fifty cents and one dollar—they consented that one of the tickets of each denomination should be annexed to the agreement and attached to the transcript to serve as samples of all the tickets, and that the Supreme Court should consider the tickets annexed to the agreement as such samples, and as if the whole of the package of tickets had been copied into and made part of the transcript.

The agreement referred to, signed by the respective attorneys, has been attached to the transcript with the sample tickets alluded to. They are all alike except as to amounts being printed on one side but with the name Reed McLane written on the reverse or back of each ticket.   The following is a copy of the face of the tickets:

| REED McLANE. |
| 25 CENTS |
| IN GOODS. |

Reverse side, REED McLANE.

The only evidence offered by the opponent was the package of tickets mentioned in the agreement of counsel and the testimony of R. E. O'Niell, the son of John A. O'Niell, and his book-keeper.  He testified that the business of his father was merchandising; that the insolvent owed his father $820 when he made a surrender; that of this claim $600 were represented by labor tickets; that they were endorsed by Reed McLane; that he is familiar with his signature; that they represent the original amount paid laborers; that his father came into possession of them by taking them from the laborers for merchandise.

This evidence is totally insufficient to support the judgment.  It is not shown who the laborers were who held these tickets; upon what

work they were engaged or when engaged; there is no evidence to show that the shingles upon which a privilege is claimed were made, or the trees from which they were made, were either belted, cut or hauled while the particular persons from whom O'Niell obtained these tickets were in the employ of McLane, and there is nothing to explain the tickets themselves.

Evidence very different from that which we find in this record would be required to show, either a transfer of the claims of the laborers with subrogation to the merchant, or a payment with legal subrogation by the latter. The tickets referred to when coupled with proper evidence under special pleadings might be very important in a given case, as leading up to a privilege, but as we find them with the testimony actually adduced in respect to them in the transcript, they serve only to support a claim for an ordinary debt. That he is an ordinary creditor to the amount shown by the tickets is conceded. The opposition of John A. O'Niell to the account should have been rejected.

ON THE OPPOSITION TO THE PRIVILEGE CLAIMED BY THE CURTIS & CO. MANUFACTURING COMPANY.

The evidence shows that in March, 1891, George H. Ruffin, as the agent of the Curtis & Co. Manufacturing Company, which had its domicile in the State of Missouri, sold at Jennings in the State of Louisiana to the insolvent Reed McLane, a citizen of the latter State, certain machinery belonging to said company. The terms of sale were five hundred dollars cash, the balance on time. The machinery purchased was with the exception of a small part thereof at the time of the sale in Missouri. The portion not in Missouri was in Erie, Pa. The terms agreed on in Jennings were f. o. b. (free on board) cars at St. Louis, McLane to pay all freights from St. Louis to Franklin, La. Subsequently to the sale, but before shipment, a double-block machine was substituted for the ten-block machine. The machine was shipped from St. Louis to McLane at Franklin, and he paid the freight.

The Curtis & Co. Manufacturing Company did not have in stock, at the time of the contract, an engine and boiler constituting part of the machinery contracted for, and that company ordered them from the manufacturers at Erie, Pa., to be shipped directly to McLane at Franklin. It was understood between the parties that McLane was

to get credit for part of the freight from Erie to St. Louis, and he was in fact credited for that sum.

There is no contest as to the indebtedness due by the insolvent under the contract; the litigation is exclusively as to whether it is secured as to its payment by privilege.

In their briefs opponents say "there are certain facts which counsel for the syndic will claim to be proven and which counsel for opponents will concede the record establishes in order that the determinative facts may be more quickly reached. It is shown that the Curtis & Co. Manufacturing Company had their domicile and place of business in St. Louis, Mo.; that Reed McLane lived in Louisiana; that George H. Ruffin was the agent for the company and made the transaction with McLane at Jennings, La.; that Ruffin had full authority to bind his principals by any bargain that he would make; that the machinery was shipped by the company from St. Louis to Reed McLane at Franklin, La. Such a statement might justify the account filed, but these are not all the facts, evidence as to which strips the transaction of the privilege allowed." They then say that to facilitate the court they quote literally as much of the evidence as is needed to show the necessary facts.

Following the quotations which they make, counsel say:

We will now submit the following legal propositions arising out of the facts proven, as determining the question of privilege *vel non.*

1. That the machinery bought by McLane was delivered to him when it was delivered to the carrier at St. Louis, and was always thereafter at his risk and in his possession.

2. That the contract by the selling agent in Louisiana was merely executory, and was not an executed contract until, under the terms of the contract, the goods were placed upon the cars at St. Louis.

3. That the contract was merely executory, and that no title could or did pass to McLane until the manufacture and selection of these goods was complete, nor until they were set apart irrevocably as his by the vendor at St. Louis, Mo.

4. When a sale is made in Louisiana of goods to be delivered in St. Louis, by the terms of the contract, the sale takes place in law in St. Louis, and the vendor has no privilege in Louisiana.

5. That when a contract is made in one place to be executed in another, and the laws of the two places differ, the rights and obligations of the contracting parties are fixed by the law of the place of execution.

6. That the chattel mortgage given on these goods in Louisiana is null, void and meaningless, and is not to be considered at all; and that this would be equally true of such a contract made in another State to affect personal property in Louisiana.

7. That after completion of the sale and the passing of the title at St. Louis, there was no act that the buyer could do or contract that he could make in Louisiana or elsewhere which would fix upon the property a privilege which did not arise from the contract under the laws of Missouri.

8. That the laws of sister States do not give the seller of personal property a privilege or lien upon the property.

It is admitted that Ruffin, who represented the Curtis & Co. Manufacturing Company in Louisiana, had full authority to bind it by any contract of sale which he might make without referring his action to Missouri for its approval and ratification. Had the company at the time of the contract had a shingle saw-mill outfit answering or corresponding in every particular with the description given of the machinery in the contract between McLane and the company, and these two parties had contracted with direct reference to that particular outfit on precisely the same terms and conditions as they did in the actual contract which they made, the contract would have been a Louisiana contract of sale, carrying with it a vendor's privilege in favor of the seller for the security of the credit portion of the price. The contract actually made between the parties was identical in many respects with the supposed Louisiana contract of sale, which we have just spoken of. There were the two contracting parties dealing with each other in Louisiana, with absolute power over the subject matter of the contract; there was the same *aggregatio mentium* as to the price and its time and mode of payment and as to an object to be bought and sold accurately described and well understood, but there were some differences between the two cases. In the *supposed* contract the ownershp of the particular thing contracted for (then in Louisiana) passed as between the parties at once from the company to McLane, even before delivery, while in the contract actually made there was no immediate shifting of ownership for the reason that although the agreement reached a point which would characterize it as a legal contract between the parties and bring it within the literal definitions given in Arts. 2439 and 2456 of the Civil Code, the first of which declares

that "the contract of sale is an agreement by which one gives a thing for a price in current money and the other gives the price in order to have the thing itself," and that "three circumstances concur to the perfection of the contract, to-wit: the thing sold, the price and the consent," and the second declares that "the sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and the price thereof, although the object has not yet been delivered, nor the price paid," yet the identical thing purchased has not been selected though clearly indicated as to its species or class (Civil Code, Art. 1886). Under such circumstances an application of the general rule announced in Art. 1909 of the Civil Code that "if the obligation between the parties be to deliver an object which is particularly specified, it is perfect by mere consent of the parties," and that "it renders the creditor the owner, and although it be not delivered to him puts the thing at his risk from the date of the obligation," is modified by the fact that an instantaneous transfer of any specifically selected or appropriated machine was not contemplated.

The agreement between the parties, while it had reached the point of creating civil ties between them, was lacking in some particulars in the features and results of a thoroughly perfect and completed sale. The identical machine which ultimately, by selection, designation or appropriation, would be brought directly under the operation of this contract, would remain, as to its ownership and risk, temporarily in the company. It is upon this special feature of the contract we are now considering, and the fact that some other act, besides "the mere consent of the parties" was necessary to be done, had to be done after the contract had been given, in order to bring the contract to a thoroughly perfect sale, with its full results and effects, and that this act would have to be done in Missouri, and not in Louisiana; it is upon this that opponents rely. They contend that the contract received its final consummation in Missouri, by the designation in Missouri of the particular outfit which was to be applied to the contract—that there was no privilege possible until there was a transfer of ownership, and if such a privilege was to result at all from the contract, it would spring *into existence the very moment ownership* vested in McLane, and ownership vesting in Missouri, where no privilege was given by law, none could be made exist by a

subsequent taking of the property to Louisiana. Such we understand to be opponents' position. They designate the delivery of the articles to the carrier at St. Louis on the cars as the time and place at which, and the fact from which, the contract of sale became fully absolute, and the rights of parties fixed, their theory being that by the contract McLane *agreed to receive the articles there as his property, and to deal with it thenceforward as his own.* They regard the agreement by McLane to pay the freight from St. Louis as conclusive evidence of a delivery by the company to him at that time, and a delivery at that point as absolutely inconsistent with the idea of continued ownership of the property by the company from St. Louis to Franklin. We do not regard the agreement of McLane to pay the freight from St. Louis to Franklin, La., as by any means necessarily leading up to the conclusion that he was to receive delivery of the goods at the former place—such a stipulation is often considered as an element by a purchaser of goods in determining and fixing the price which he pays for the same. Granting, however, that the fact of paying for the freight on the goods from St. Louis may be taken as a consent by McLane to a receipt or delivery of the machinery to him at that place, it would not necessarily follow that the ownership of the machinery changed absolutely at that time from the company to him.

Opponents, in reaching their conclusion to this effect, evidently considered receipt and delivery of goods as necessarily synonymous with an acceptance of them by a purchaser. In this there is serious error. The acts are distinct. "Delivery" is one of the incidental obligations resulting from a contract of sale, while "acceptance" bears upon one of the essential elements leading up to the creation and formation of the contract itself, viz.: consent. It may be well to state here that the question whether the articles contracted for by McLane were to be delivered to him at St. Louis, or whether that place was simply indicated as the point of shipment, and as the starting point from which he was to pay the freight, is one of the controverted points in the case. We do not regard a decision of it as having the important bearing which opponents give to it. Let us now consider the question of transmission of ownership in its bearing upon the rights of parties. Opponents contend that the contract between the parties was an executory contract in Louisiana, and that it became an executed contract in Missouri, and therefore

the place of the consummation of the contract determines the question of privilege.

There obviously was but one contract between the parties—the contract made between Ruffin and McLane at Jennings. When the company at their factory or store in Missouri selected a particular outfit and sent it to the carrier for shipment they were not initiating a new agreement or acting by virtue of any original power reserved to them, but simply doing acts in execution of a contract already made; they were not at liberty to depart in a single matter from that agreement, and when the articles shipped would come to be accepted or rejected by McLane it would not be in the exercise of a new power of consent, but under an implied reserved right of holding open to that extent the final, absolute consummation of the original contract under warranty in the sense that word is used in insurance and maritime law. The acceptance by McLane, if given, would have relation back, *quoad* the place of the contract, to the contract made in Louisiana, and matters would stand legally as if the particular articles which finally reached him had been *ab initio* at Jennings. It is true that *quoad* certain results and certain parties, the executory nature of the contract might bring about important differences between the situation in the two cases, but if matters ultimately took the shape of actual acceptance and actual delivery without the intervention of disturbing factors, the legal situation in our opinion is that which we have indicated. This view of the situation is sufficient to dispose of the issues raised in the opposition. We are by no means prepared to say, however, as a matter of fact, that the ownership of these goods, whether viewed from the standpoint of a Louisiana or that of a Missouri contract, would shift in Missouri at the time, and by the fact of the segregation of a particular machine from among a number of others at the company's factory, and its being brought directly under the operation of the contract by appropriation. McLane had never seen the particular machine which would ultimately be brought in under the contract. It was in contemplation of both parties that it should reach him in Louisiana, and that while there in his possession a portion of the price would be still unpaid. It would be fair to presume, in absence of express stipulation to the contrary, that McLane should reserve right of final acceptance to a reasonable time after its receipt by him at Franklin, and that both parties should contract with reference to the operation of the laws of Louisiana upon the enforcement of the rights of the seller.

It will be observed that if there were any acts in the matter of the execution of the contract to be performed in Missouri and by the seller, there were also acts in execution by the purchaser to be performed in Louisiana, where the contract was unquestionably made. There were a double set of obligations in execution of the contract. We need not examine into the rights of parties from the standpoint of jurisprudence in courts other than our own, relatively to a change of ownership under a contract of sale of the character of that made between the parties in this case, nor discuss the difference between delivery of an object and the acceptance thereof under a contract of sale.

The question will be found discussed at length in Pope vs. Allis, 115 U. S. 371; Benjamin on Sales, Secs. 701 and 706; *Id.*, p. 1153; Winfield Water Company vs. Winfield, 33 Pacific, 718.

After careful consideration of the important question involved in this litigation we have reached the conclusion that the judgment of the District Court recognizing the vendor's privilege as securing in favor of the Curtis & Co. Manufacturing Company the unpaid portion of the price due to it on the sale of the machinery sold by George H. Ruffin to the insolvent Reed McLane is correct, and should be and it is hereby affirmed.

For the reasons herein assigned it is further ordered, adjudged and decreed that the judgment of the District Court sustaining the opposition of John A. O'Niell and recognizing and decreeing in his favor the privilege claimed by him be and the same is hereby annulled, avoided and reversed, and it is hereby decreed that the said opposition be rejected, costs of this opposition in the District Court to be paid by said opponent. It is further decreed that the costs of appeal be paid by the opponents in both oppositions.

Rehearing refused.