## No. 12,961.

THE DE LA VERGNE REFRIGERATING MACHINE COMPANY VS. THE NEW ORLEANS AND WESTERN RAILROAD COMPANY.

51 1733
52 1849

### SYLLABUS.

1. A contract for two cotton compresses was made under a fixed limit as to time of completion. One was completed, delivered and accepted within the time. The other was not, but the contractor was not put in default, no demand was made for dissolution of the contract, and the contractor was

permitted to proceed with its execution. Thereafter the other party could not arbitrarily declare cancellation of the contract and decline to receive the press. Under the circumstances, HELD, the press should have been accepted and the contractor proceeded against for damages, 'if any, caused by the delay.

2.  When one party offers to perform a condition precedent and is prevented by the other, the offer will be treated *as performance,* and the conduct of the other party as excusing performance.

3.  A contract made in New York to be executed and consummated in Louisiana —the acceptance of the thing forming the object of the contract being dependent upon a suspensive condition, to-wit:—that after completion a stipulated test is to be applied—which test is to be made and can only be made in Louisiana, is a Louisiana contract, and the thing sold subject to the vendor's privilege accorded by the Louisiana law.

APPEAL from the Civil District Court for the Parish of Orleans. *Ellis, J.*

*Denegre, Blair & Denegre* for Plaintiff and Appellee.

*Farrar, Jonas, Kruttschnitt & Gurley* for the Defendants, Appellants.

Argued and submitted March 21, 1899.
Opinion handed down May 15, 1899.
Rehearing refused June 30, 1899.

The opinion of the court was delivered by

BLANCHARD, J.  Plaintiff company and a corporation known as the Delta Construction Company, on July 10, 1895, entered into a contract whereby the former obligated itself to construct, erect and deliver to the latter on certain premises in the State of Louisiana two cotton compresses and appurtenances, one a 2,000-ton Bierce press, the other a 4,000-ton Webb press.

The price agreed upon for the two compresses was $80,000, with exchange on New York, a portion of which was to be paid at the signing of the contract, other portions as the work progressed, and the remainder, $32,000, sixty days after completion.

It was stipulated that the Bierce press was to be completed and ready for work 120 days after date of the contract, and the Webb press 150 days thereafter.

A further stipulation embodied the guaranty on part of plaintiff company that the compresses would, when completed, compress 120

FIFTY-FIRST ANNUAL REPORTS, 1899.    1735

De La Vergne Co. vs. N. O. & Western R. R. Co.

bales of cotton, measuring 28x56, and weighing, approximately, 500 pounds each, in an hour and twenty-five minutes; and that each of these bales so compressed, measured an hour after compression, would show an average density of thirty pounds per cubic foot.

The parties to the contract were both New York corporations and the contract was entered into and signed in that State. It was to be executed in Louisiana.

Subsequently, the New Orleans & Western Railroad Company, a Louisiana corporation, succeeded, by transfer and subrogation, to all the rights of the Delta Construction Company in and to the contract.

The Bierce press was constructed and erected within the time agreed on, and with reference to it there is no controversy.·

The Webb press was not constructed within the time agreed on, and at the end of that period, or on December 3, 1895, an important modification of the contract was agreed on between the parties.

It was proposed by the Delta Construction Company and accepted by plaintiff company.

The proposal was the result of a conversation the parties had had that day (December 3, 1895 ) relative to the delays in completing the compress, and its object was stated to be to settle all questions as to damages caused by the delays. The proposal and its acceptance were in writing and its essential features were these:

"The company (the Delta Construction Company) will pay you $8,000 on account of the original contract on or before December 10, 1895; $8,000 on March 1, 1896; $8,000 on June 1, 1896, and the balance due on said original $80,000, after deducting all previous payments, sixty days after the Webb press is ready to operate and has been tested accordingly.

"It is distinctly understood that this additional memorandum to the original contract shall not change in any manner, or alter, the guarantee as to the performance of the presses, given by you in said original contract dated July 10, 1895."

This written modification of the original contract, it will be observed, waived the time limit and damages incident thereto, and permitted the execution of the contract for the erection of the Webb press to. proceed without naming another time or date as to which it should be completed.

However, it is conceded by both parties that, contemporaneously with its execution, an oral agreement was made that the time for the

1736 SUPREME COURT OF LOUISIANA.

De La Vergne Co. vs. N. O. & Western R. R. Co.

completion of the press under the modified contract should be March 1, 1896.

This modification of the contract, as well as the oral agreement as to March 1st for its completion, took place in the City of New Orleans between the representatives of the contracting parties.

The compress was not completed by March 1, 1896. The reasons assigned for this are that the press (Webb) was of unprecedented size, weight and power, that it was nearly twice as large as any compress that had ever theretofore been ordered, that in consequence special models, moulds and dies for the enormous castings, etc., had to be made, certain parts of the press were compelled to be ordered from foundries and machine works, other than plaintiffs', having special adaptability, or facilities, for such work, etc.

But, notwithstanding its non-completion on March 1st, defendant neither put plaintiff in formal default in reference thereto, nor brought suit to annul the contract because of failure to timely complete, nor was complaint on this account made at the time.

Plaintiff proceeded with the work of the press, expending large sums of money in materials and labor.

In April, 1896, defendant company entered into contracts with cotton factors in New Orleans to handle, store and compress their cotton for the season of 1896-7, beginning September 1, 1896. As the result of these contracts, the company handled of that season's business over 300,000 bales of cotton, of which it compressed over 225,000 bales.

And we find that late in April, 1896, under the belief that *four* compresses were necessary to equip the company with proper facilities for doing its business, it contracted with W. W. Bierce to construct two additional compresses on the premises, to be completed one September 1, 1896, the other October 1, 1896.

All during the months of March and April, and while the contracts with the factors for the delivery of cotton, and the one with Bierce for the two additional compresses, were being made, plaintiff's contract for the Webb press was not interfered with, and this condition of affairs continued down to May 1, 1896, when defendant company wrote plaintiff from their New York office to the effect that advices from their New Orleans office stated the Webb press had not arrived yet, and referring to the fact that they (defendant) had already suffered damages through the delay, and that the erecting of the press would

further interfere with the general work and operation of their plant, admonished plaintiff that unless due diligence was shown in completing the contract, damages would be charged for the delay, or defendant "would refuse to accept the press altogether."

Plaintiff answered this on the 19th of May to the effect that every effort to complete the press at the earliest possible moment was being made, and it was expected to have it ready for operation before the cotton season opened.

Matters rested thus until June 3, 1896, when defendant wrote again advising that, from the outlook, the completion of the press by *August 1, 1896,* was highly problematical, and stated that unless it was in working order by that time, "we hold you responsible for whatever damages we may suffer from the fact of its non-completion prior to that date."

Plaintiff replied to this, reiterating that everything possible was being done to complete the press, and that it was confidently expected to have it in operation by August 1, 1896.

It will be observed that both these letters of defendant (of May 11th and June 3rd) had in contemplation the holding of plaintiff responsible in damages for further unreasonable delay in completing the press, and the one of June 3rd, for the first time, intimated August 1st as *the time* beyond which plaintiff would not be permitted to go without incurring the penalty.

It is true the letter of May 11th mentioned the possibility of defendants refusing "to accept the press altogether," but this can not be viewed by any manner of means as an *ultimatum.* It was put only in the alternative, and, as a consequence, plaintiff was justified in concluding that if due diligence (in the language of the letter) was not shown in completing the press, the only effect would be the incurring of damages on their part.

Nor can plaintiff's reply to the letter of June 3rd, be viewed as an *acceptance* of August 1st as *the time* when the press would positively be completed.

But even if it were so accepted, the very letter of defendant, to which it was a reply, mentioned nothing more formidable than the incurring of liability for damages as the consequence of the failure to complete by August 1st.

That is to say, defendant's letter informed plaintiff that unless the press was in readiness for operation by August 1st, plaintiff would be

held for damages suffered *prior to that date.* This can be reasonably given no other meaning than that if the press *were* completed by that time defendant waived all damages suffered by the delay up to that date; if *not* completed by that time, defendant would assert a claim for whatever damages it may have incurred previous to August 1st. This, of course, left defendant free to claim also, *a fortiori,* the damages which might accrue to it by delaying completion of the press *after* August 1st.

That this is the correct interpretation to be put upon these letters of defendant is shown by the next communication addressed to plaintiff, that of June 26th, 1896, wherein it was said: "You were notified sometime ago that unless this compress was ready for operation by the first of August, serious damage and injury would be inflicted upon the company, *and you would be held therefor.*" (Italics ours.)

There was, it will be observed, nothing here beyond claiming damages.

The letter, then, solemnly warns, plaintiff that if the compress is not ready by August 1st, large damages will immediately begin to accrue and the amount thereof will progress from day to day. The letter elaborates upon this, going into details to show to what inconvenience and loss the New Orleans and Western Railroad Company would be put by delaying completion of the press beyond August 1st, and how serious the matter was viewed by that company to be, both to themselves and to plaintiff company.

By this letter defendant again signified its election to consider the contract still in force, and to require plaintiff to go on and complete it. And so plaintiff proceeded with the work.

On July 13, 1896, the unloading of some cars of material for the press, that had arrived, was stopped by the officers of defendant.

Relative to this, plaintiff's local agent wrote defendant, calling attention to the fact that the time originally named in the contract for the completion of the work was afterwards extended, declared that the essential and principal parts of the press were then on hand in cars which had arrived, and demanded the right to unload the material and proceed with the work of erecting the press. This remonstrance had the desired effect. The opposition to unloading the cars ceased and the work on the press continued.

Three days later, July 16th, defendant's vice-president in New York, wrote plaintiff in that city, that if the compress was not com-

pleted by the first of August the contract would be canceled, and plaintiff required to remove from the premises. This letter also warned plaintiff that in proceeding further with the work it must be with the understanding that if the press was not ready for operation by the time named the contract would be canceled.

This appears to have been the first positive announcement made by defendant to plaintiff that the contract for the press would certainly be canceled should it not be completed by August 1st. It was then within fifteen days of that time, and the situation with regard to the press was such that it was a physical impossibility to complete it by then.

The letter of July 16th was followed by another of July 21st, in which defendant tells plaintiff that from information received it is deemed quite impossible the press can be completed by August 1st, and again expresses the intention to cancel the contract if it be not ready for operation by that time. This letter states it recognizes the right of plaintiff to continue work upon the compress down to the first of August, but it is at plaintiff's risk, for the contract would be treated as canceled if there should be a failure to complete by then.

Plaintiff replied the next day that it was not believed the compress could be completed by August 1st, but that it would not be long thereafter when it would be. The letter then states that plaintiff did not propose to let defendant suffer any damages at all on account of the incompletion of the press by August 1st, and that every effort would be made to have it ready to compress cotton when needed for that purpose; and, the letter adds, "we expect every co-operation on your part, and  *  *  *  not to be interfered with by you or your men." It also states that it was hardly believed defendant was in earnest in announcing a purpose not to allow further work on the press if not completed by August 1st, and that such a course would result in great loss and damage to plaintiff for which defendant would be held responsible.

Defendant answered this on July 30th, reiterating its purpose to prohibit further work on the press if not completed by August 1st, and this was followed on August 3rd by a notice to plaintiff to cease operations and to remove the parts thereof from the premises.

By letter from headquarters plaintiff was notified of the termination of the contract, and that access to the premises was denied its officers and employees.

Force being threatened, if necessary, to exclude plaintiff from the premises, the latter had recourse to the courts, applying for a writ of injunction to restrain defendant from interfering with the erection of the press.

The application was granted, and under protection of the writ plaintiff proceeded with the erection of the press.

It was completed and formally tendered to defendant on September 17, 1896. The evidence satisfies us its completion would have been accomplished some days sooner than this had it not been for defendant's attitude of hostility to further work and the obstacles (short of violating the mandate of injunction) thrown in the way.

The tender of the press was refused, defendant absolutely declining acceptance. Not only this, but it refused positively to supply the cotton to make the test of the press required by the contract, and when plaintiff purchased some cotton to make the test with, defendant gave instruction to prohibit the use of its steam power for the purpose.

The right to make the test was duly and repeatedly demanded by plaintiff, and defendant fully put in default in reference thereto.

Following defendant's refusal to accept and pay for the press, this suit was brought, claiming a balance of $32,000 due on the contract for the two presses, and averring the contract to be a Louisiana contract because designed to take effect and be carried out in this State, and because the modification thereof was made and accepted in this State, plaintiff claims the vendor's privilege on both presses with their boilers and appurtenances, all of which it is alleged are removable without prejudice to the realty.

Defendant's answer to the suit sets forth in detail its grounds of complaint against plaintiff for failure to timely complete the Webb press, denies that any serious difficulties resulted from its size or design, charges plaintiff with negligent delay, avers the press could have been completed by March 1, 1896, if due diligence had been used, etc., etc., and represents that plaintiff's conduct in failing to complete it, within the time aforesaid, constituted, under the circumstances, an active violation of the contract authorizing its cancellation. It denies that any of its (defendant's) acts or doings in reference to the contract constituted any waiver on its part of its right to take advantage of plaintiff's active or passive violation of the same, or any election of what remedy it would pursue.

It asks for recognition of its right to cancellation of the contract, and prays for judgment in reconvention for damages alleged to have been suffered by reason of the failure to complete the compress as agreed upon.

It avers that if defendant is adjudged to take the press and pay the price, then it asks judgment for damages caused by the delay in the execution of the contract and because defendant was compelled to buy another press, which was purchased in consequence of the failure of plaintiff to erect, within the time specified, the Webb press.

These claims for damages are set forth in detail as to amount and averments of fact.

Judgment below was in favor of plaintiff for the sum sued for, with recognition of the vendor's privilege on both presses, and rejecting defendant's demands in reconvention.

This appeal followed.

This contract was for two compresses and their erection. A time limit was fixed. Within this limit the contract was partially executed by furnishing and erecting one press.

Defendant accepted this press, but did not elect to consider the contract at an end as to the other press.

On the contrary, it consented to a modification of the contract in this particular, permitted and required plaintiff to go on with the work of the second press, and March 1, 1896, was agreed on as the extended time for its completion.

When this period arrived and the press was not completed, defendant failed to put plaintiff in default, and by its action or non-action in this regard must be considered as having elected to permit plaintiff to proceed with the work and complete it.

This election by defendant—that plaintiff should complete the press rather than that the contract should be considered ended—was, we think, adhered to down to July 16, 1896, when notification was given that if the press was not completed by August 1st, the contract would be canceled.

The communications addressed during April, May and June of that year by defendant to plaintiff are to be viewed, we think, as remonstrances against the slowness which defendant thought characterized the work on the press, and as warnings that plaintiff would be held in damages if not completed by August 1st.

In other words, defendant allowed plaintiff to go on with the work,

intending to hold the latter responsible for the damages which might be caused by the delay in its completion. And plaintiff, on this, did proceed with the work, expending large sums and pushing the work so as to have the press completed by the opening of the cotton season, say, September 1, 1896.

Under these circumstances, defendant could not arbitrarily, on July 16th, fix upon August 1st as the final day for the completion and ·delivery of the press.

Its previous conduct and action had placed it out of its power, of its own volition and without the consent of plaintiff, to dissolve the contract and deny the right to carry the work of the erection of the press forward to completion. It was estopped from altering its position to the detriment of plaintiff. The latter had acted upon a condition of affairs, *assented* to by defendant, which justified it (plaintiff) in believing it would be permitted to complete the contract, taking the risk of being held for damages resulting from delay.

It should have been permitted to complete the press, and upon its completion defendant should have consented to the tests the contract called for, and if the press measured up in results to the requirements, defendant should have accepted it, under proper reservation of its right to claim compensation for whatever damages may have been occasioned by the delays.

Gayden vs. Railroad Co., 39 La. Ann. 269; Turner vs. Collins, 2 Martin (N. S.) 605; Back vs. Slidell, 1 La. Ann. 375; C. C. 2046, 2047.

We agree with our brother of the District Court that defendant's demand in the instant suit can not be construed, under the circumstances here presented, the seasonable demand for dissolution judicially required by the articles of the Code just cited.

And we further agree with him that defendant must take the press and pay the price, and that its conduct in refusing plaintiff the facilities to make the test when the press was tendered, and the offer to test was made, has forfeited its right to the test required by the contract, and it can not now demand the same as a condition precedent to its acceptance of the press and payment of the price. When one party offers to perform a condition precedent, and is prevented by the other, the offer, under the circumstances here disclosed, will be treated as *performance,* and the conduct of the other party as excusing performance.

This is strengthened by the fact that since September 1896, plaintiff has had no access to the press, and defendant has permitted it to stand exposed, unused and uncared for. Besides, when plaintiff offered the test it had a corps of skilled employees ready to make it and the inventor of the press was present to superintend it. These conditions do not now exist, and, under the circumstances, it would be inequitable and unjust to require plaintiff to prove the efficiency of the press by the required test.

If when defendant comes to make use of the press, inherent weakness or intrinsic defects should appear or develop, showing that when the press was completed and tendered, either from defective materials used or bad and unskillful workmanship, it was not up to the contract requirement, then would defendant have a just claim against plaintiff for reimbursement of the damage incurred in this behalf, and its rights in this respect will be reserved.

But from this should and would be excluded any damage or injury to the press occasioned by the long period it had been permitted by defendant to lie idle, exposed and uncared for, and if the press should fail of satisfactory work because of these conditions defendant would have no just claim against plaintiff.

The contract for the presses, while made in New York, was to be executed and consummated in Louisiana. The presses were to be erected and completed here, and there was a *suspensive* condition in the contract, viz:—that after completion a test, stipulated for in the contract, was to be applied here, and the acceptance of the presses by defendant was dependent on their performance measuring up to the requirements of the test. The presses and their appurtenances remained the property of the plaintiff and at their risk until thus tested and accepted. Hence, the delivery of the presses was to be accomplished here.

The contract, therefore, must be held a Louisiana contract, and the presses subject to the lien accorded by our law to the vendor. McIlvaine & Speigel vs. Legare et al, 36 La. Ann. 362; McLane vs. Creditors, 47 La. Ann. 135-141; 10 La. Ann. 728; 22 La. Ann. 418; 21 La. Ann. 412; 32 La. Ann. 1288; 38 La. Ann. 218, 574; Benjamin on Sales, Secs. 308, 319, 651.

Inasmuch as the contract was *one* contract for two compresses and their erection at a stipulated price *in globo* for the two, upon which price $48,000 has been paid, leaving due a balance of $32,000,

the vendor's privilege is considered as extending to and operative upon both presses.

This brings us to the consideration of the damages claimed by defendant in reconvention.

We do not find that defendant was damaged by any inconvenience or loss in handling or pressing cotton. The last of the two compresses was completed in time for service when most needed during the season's business of cotton compressing. The Bierce press, first completed, it seems, had ample capacity to meet the requirements up to the time when the second press was ready for service.

But we do find that while defendant should be required to take the Webb press and pay the price, it had just cause of complaint against plaintiff on account of the delays which did ensue in respect to its erection. The contracts with factors for the handling of over 300,000 bales of cotton made defendant justly solicitous that the Bierce compress erected by plaintiff, and two others of the same patent subsequently erected by W. W. Bierce, would not suffice for the season's business. It concluded it needed another compress, and having cause to believe that the Webb compress under construction by plaintiff might not be completed in time for the season's full business, a contract was made with Bierce for another of his presses.

While there may be force in plaintiff's contention that this was error of judgment and bad business policy, the circumstances out of which sprang, in the opinion of defendant, the necessity for this purchase, are attributable to the laches of plaintiff, and all doubt, therefore, as to the advisability of the step must be construed against the latter.

This fourth Bierce press was not erected, and in April 1897 it was disposed of at an equal price to a Little Rock concern. But the evidence, we think, reasonably establishes that from the time this press was purchased, in July 1896, to the time of its sale in April 1897, a loss to defendant of four thousand dollars ensued by reason of the cost and expense of holding, handling and looking after the press, interest charges, etc.

The contract with Bierce for the press expressed $40,000 as its consideration, but it seems that he (Bierce) claimed and was allowed four thousand on account of the expenses referred to.

This sum, not being unreasonable, should be reimbursed defendant by plaintiff.

The assertion by defendant that this press was intended to be erected on the site of the Webb press, and it was not so erected because plaintiff held possession of said site, may have been all pretense, but the fact remains that in July 1896 defendant had grounds for believing that the Webb press might fail of erection in time for the season's business, and it had, under the circumstances, sufficient justification for being forehanded in concluding arrangements for another press.

We think an equitable adjustment of the differences between the parties would be to require defendant to take the Webb press and pay the balance of price due, less the four thousand dollars referred to.

It is, therefore, decreed that the judgment appealed from be amended so as to read as follows:

It is ordered and adjudged that plaintiff do have and recover of the New Orleans & Western Railroad Company and Charles B. Van Nostrand, in his capacity as Receiver of said Company, defendants, the sum of thirty-two thousand dollars, with five per cent per annum interest thereon from September 17, 1896, until paid, and that to secure this sum there is recognized as existing in favor of plaintiff the vendor's lien and privilege on the Bierce press and the Webb press, with the boilers and appurtenances thereto belonging, supplied and erected by plaintiff on the premises of defendant at Port Chalmette, Louisiana, under the contract of July 10, 1895, as modified December 3, 1896; that said privilege be enforced as against said compresses, boilers and appurtenances; and that plaintiff be paid by preference out of the proceeds thereof.

It is further ordered, etc., that defendant do have and recover of plaintiff, on its demand in reconvention, the sum of four thousand dollars, with five per cent per annum interest thereon from (say) April 10, 1897, until paid.

It is further ordered, etc., that defendant's right to claim reimbursement for damages suffered should inherent weakness or intrinsic defects, resulting from either defective materials or bad and unskilled workmanship, appear or develop within a reasonable time in said Webb compress, be reserved to it, as hereinbefore set forth; but this stipulation in its favor is not to interfere with the due execution of this decree.

It is further ordered etc. that, as thus amended, the judgment appealed from be and is hereby affirmed, costs of the lower court to be borne by defendant, those of appeal by plaintiff.