JERRE S. WILLIAMS, Circuit Judge:
Associates Commercial Corporation appeals from a district court judgment holding that under Louisiana law Mitsubishi International Corporation has a valid vendor’s privilege on steel pipe sold to Clark Pipe & Supply Co., and that Mitsubishi’s privilege primes Associates’s chattel mortgage on the same pipe. We affirm the holding of the district court.
I. FACTS
Clark Pipe & Supply Co. was in the business of buying and selling steel pipe. From 1979 through 1981, Clark purchased various quantities of Japanese manufactured steel pipe on credit from Mitsubishi. In their ordinary course of dealing, Mitsubishi’s parent corporation, Mitsubishi Corporation Tokyo, would contact Mitsubishi when the Japanese steel mills “opened their books” each quarter for orders, and Mitsubishi would solicit business from various pipe purchasers, including Clark.
Negotiations would take place by and between Mitsubishi and Clark, and after an agreement was reached, Mitsubishi would place an order for the pipe with Mitsubishi Corporation Tokyo.- Mitsubishi Corporation Tokyo would in turn place an order with a Japanese steel mill.
At the time that each of the five oral contracts or agreements at issue were concluded, the specific steel pipe forming the basis of each agreement was either not in existence, or was in the general inventory of the Japanese steel mill. The pipe, would later be manufactured or taken out of inventory. The specific pipe being sold to Clark was designated as such at the Japanese steel mill by identifying numbers placed on the pipe itself. The pipe was subsequently shipped by vessel “CIF” by Mitsubishi Corporation Tokyo to Mitsubishi. Customs duties, insurance and freight were part of the purchase price paid by Mitsubishi. After the transporting vessels left Japan, the bills of lading were at all times held by Mitsubishi or its agents. Physical delivery of the pipe to Clark took place only after the pipe was unloaded on the dock in New Orleans and a customs broker under contract with Mitsubishi ensured that the pipe had cleared customs and the necessary charges were paid.
*162 On or about May 3, 1982, Mitsubishi filed a petition in Louisiana district court asserting a vendor’s privilege[1] on the steel pipe sold by Mitsubishi to Clark. Subsequently, on May 7, 1982, Clark instituted bankruptcy proceedings. Mitsubishi then instituted an adversary proceeding against Clark, the debtor in possession, asserting a vendor’s privilege arising from the Louisiana sale of the pipe to Clark and asking for an order lifting the automatic stay of Section 362 of the Bankruptcy Code so as to permit Mitsubishi to reclaim the pipe. On May 19,1982, Associates intervened asserting that its chattel mortgage on Clark’s inventory was superior to Mitsubishi’s claim.
The bankruptcy court rendered a judgment in favor of Mitsubishi. Appeals were filed by Associates and on behalf of Clark when it was in Chapter 11 Bankruptcy proceedings. Subsequently, Clark was adjudicated bankrupt pursuant to Chapter 7 of the Bankruptcy Code and the trustee in bankruptcy disclaimed the pipe at issue and abandoned this appeal on behalf of the debtor’s estate. The district court affirmed the judgment of the bankruptcy court as not clearly erroneous, and Associates appeals to this Court.
II. STANDARD OF REVIEW
The first question presented on appeal is whether the district court committed reversible error by using the “clearly erroneous” standard in reviewing the findings of fact of the bankruptcy court. Associates argues that because the district court rendered its decision in this matter on May 4, 1983, the Interim Emergency Rule promulgated by the United States District Court for the Eastern District of Louisiana required the district court on appeal to hold hearings and receive evidence “as appropriate.” Therefore, Associates continues, the “clearly erroneous” standard should not have been applied.
In Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Supreme Court held unconstitutional the jurisdictional grant of the Bankruptcy Reform Act of 1978 (“the Act”).[2] The Act established a bankruptcy court in each judicial district as an adjunct to the district court, and granted the bankruptcy courts jurisdiction over “all civil proceedings arising under title 11 [the bankruptcy title of the United States Code] or arising in or related to cases under title 11.” Because the Act conferred judicial power upon bankruptcy courts comparable to that granted Article III courts, without establishing safeguards to the independence of the bankruptcy judiciary comparable to those granted Article III judges, the Court held the Act violated Article III of the United States Constitution. Although the case was decided on June 28, 1982, the judgment was specifically made prospective only, and was stayed until December 24, 1982, to “allow Congress an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication, without impairing the interim administration of the bankruptcy laws.” Id., 102 S.Ct. at 2880. Between June 28, 1982 and December 24,1982, courts around the country adopted emergency local rules designed to delegate certain authority to the bankruptcy courts and thus allow them to operate until Congress had acted to reform the 1978 Act. The emergency rule adopted by the United States District Court for the *163 Eastern District of Louisiana states in part that:
In conducting review, the district judge may hold a hearing and may receive such evidence as appropriate and may accept, reject, or modify, in whole or in part, the order or judgment of the bankruptcy judge, and need give no deference to the findings of the bankruptcy judge. At the conclusion of the review, the district judge shall enter an appropriate order or judgment.
Interim Emergency Rule (e)(2)(B).
Appellee questions the applicability of the Emergency Rule to this proceeding on the basis that the bankruptcy court decision was made after Marathon was decided, but before it was made effective. Because the bankruptcy courts were not stripped of any of their powers by Marathon before it actually became effective on December 24, 1982, appellee argues that the same “clearly erroneous” standard that is proper in reviewing any fact question decided by an Article III court was applicable to the district court’s review of this action.
Absent the Emergency Rule, pre Marathon law would properly be applied after Marathon was decided but before it became effective. We find, however, that the standard of review established by (e)(2)(B) of the Emergency Rule was clearly intended to be applied to proceedings such as the one before us. Paragraph (h) of the rule states in pertinent part: “[tjhis rule shall become effective December 25, 1982, and shall apply to all bankruptcy cases and proceedings not governed by the Bankruptcy Act of 1898 as amended, and filed on or after October 1, 1979.” [3] By the wording of subparagraph (e)(2)(B) a district judge is not compelled to apply the “clearly erroneous” standard. Rather, the court is allowed discretion in determining whether to defer to the findings of the bankruptcy court. The court is certainly not prohibited, however, from applying the “clearly erroneous” standard.
Of relevance to our inquiry is the case Matter of Missionary Baptist Foundation of America, 712 F.2d 206 (5th Cir.1983) (decision of bankruptcy court — July 12, 1982; decision by district court — December 15, 1982; decision by this Court — August 18, 1982). That case was decided in the bankruptcy court before Marathon, and the district court ruled before Marathon became effective, but the case was reviewed by this Court on appeal after Marathon became effective. We decided that “[fjindings of fact made in a bankruptcy proceeding will not be set aside unless clearly erroneous ... Strict application of the clearly erroneous rule is particularly important where, as here, the district court has affirmed the bankruptcy judge’s findings.” Missionary Baptist Foundation, 712 F.2d at 209 (5th Cir.1983). Other courts have also found the “clearly erroneous” standard applicable in such cases. Matter of Neis, 723 F.2d 584 (7th Cir.1983); In re Swanson, 36 B.R. 99 (Bkrtcy. 9th Cir.1984); In re Ancor Exploration Co., 30 B.R. 802 (D.Okl.1983).
The “clearly erroneous” rule has traditionally been applied to findings of fact by bankruptcy courts. See, e.g., Matter of Bardwell, 610 F.2d 228, 230 (5th Cir.1980); Matter of Boydston, 520 F.2d 1098, 1100 (5th Cir.1975); Bazemore v. Stehling, 396 F.2d 701, 702 (5th Cir.1968). Since appellant did not request a hearing under subsection (e)(2) or question the standard of review at the time the district court ruled,[4] we are not sympathetic to appellant’s complaint that the wrong standard of review was applied.
III. LOUISIANA CONTRACTS
The bankruptcy court found that two of the five sales agreements at issue were confected in Louisiana and one was con-fected in Georgia. It could not determine *164 where the other two agreements were con-fected because of conflicting evidence. Nevertheless, the bankruptcy court held that the agreements reached by the parties were executory agreements of sale, that title to the property remained in Mitsubishi until the pipe reached New Orleans, and that contracts of sale were not perfected under Louisiana law until title passed to Clark in Louisiana. The court therefore held that the contracts were Louisiana contracts, and recognized a vendor’s privilege in favor of Mitsubishi. The district judge affirmed the bankruptcy court’s findings of fact and conclusions of law.
After reviewing the record, we affirm the bankruptcy and district courts’ findings and conclusions. First, as to findings of fact: specifically, we uphold the findings that Mitsubishi owned the pipe and was at risk for its loss until the pipe was delivered to Clark in Louisiana; that after the pipe left Japan the bill of lading was held by Mitsubishi or its agent until the pipe was unloaded on the New Orleans dock and had cleared customs; and that after delivery Clark had the right to inspect the pipe and return it for defects or deficiencies. Based on those facts we join the bankruptcy and district courts in concluding that the parties intended the sale to be perfected by delivery of the pipe in Louisiana.
We now apply those findings to Louisiana contract law. Because the Louisiana vendor’s privilege applies only to sales completed within Louisiana, In re Leggett, 505 F.2d 120, 121 (5th Cir.1974), appellant contests the conclusions of both the bankruptcy and district courts. Appellant argues that the contracts were Georgia contracts, since Mitsubishi’s agent allegedly accepted the orders over the telephone while in Georgia. In the alternative, Associates argues that since the steel pipe had identifying marks placed on it after manufacture, while still in Japan, the pipe was identified to the contract at that time. Therefore, the contract was perfected before the pipe was delivered to New Orleans. Finally, Associates contends that on two of the contracts the pipe was shipped CIF New Orleans, and that since a CIF contract is a shipment contract where title is transferred from the seller to the purchaser upon delivery to the carrier, those contracts were perfected outside of Louisiana.
As we start our inquiry into the Louisiana law we note two aged cases which are significant. In De La Vergne Refrigerating Machine Co. v. New Orleans & W.R. Co., 51 La.Ann. 1733, 26 So. 455 (1899), a contract for the construction of two cotton presses was at issue. The contract was made in New York, but the presses were to be built in Louisiana on the site where they would be used. The court wrote:
The contract for the presses, while made in New York, was to be executed and consummated in Louisiana. The presses were to be erected and completed here, and there was a suspensive condition in the contract, viz. that after completion a test stipulated for in the contract was to be applied here, and the acceptance of the presses by defendant was dependant on their performance measuring up to the requirements of the test. The presses and their appurtenances remained the property of the plaintiff and at their risk until thus tested and accepted. Hence the delivery of the presses was to be accomplished here. The contract must be held to be a Louisiana contract, and the presses subject to the lien accorded by our law to the vendor.
Id. 26 So. at 459.
Similarly, in McIlvaine & Spiegel v. Legare, 36 La.Ann. 359 (1884), three boilers were to be brought from outside Louisiana for use on a Louisiana plantation. They could be rejected upon delivery if they did not meet the requirements of the contract. The court concluded that the contract was
only executory and subjected] to the laws of Louisiana, governing such contracts. The new stipulations ... en-grafted a suspensive condition in the contract, under which it could not be executed before delivery of the things sold, in this State. Hence the conclusion that *165 it thus became a Louisiana contract, and that its enforcement must be tested under the laws of this State.
Id. at 362. The court granted the out-of-state seller a vendor’s privilege on all three boilers.
More recent Louisiana law does not establish a clear test for determining when a sale is a “Louisiana sale”. In Modern Farm Service, Inc. v. Ben Pearson, Inc., 308 F.2d 18, 22 (5th Cir.1962), we wrote:
A contract is made where an offer is accepted or where the bargain becomes mutually binding on both parties. The contract for the manufacture and sale of the eight cotton pickers became a completed transaction and mutually binding on both parties when J.B. Lancaster accepted the pickers in Pine Bluff, Arkansas, to be transported by Modern Farm at its sole expense to New Roads, Louisiana. As was stated in State v. Shields, (1903) 110 La. 547, 34 So. 673, and George D. Witt Shoe Co. v. J.A. Seegars & Co., (1908) 122 La. 145, 47 So. 444, when goods to be delivered by the seller to the buyer become segregated from other goods or appropriated to the contract so that the objects to be sold are readily identifiable, the same becomes executed, and at that time title to the goods passes to the buyer. See also Succession of Welsh, (1904) 111 La. 801, 35 So. 913, 64 L.R.A. 823, and H.B. Claf-lin & Co. v. Mayer (1889) 41 La.Ann. 1048, 7 So. 139.
(Emphasis added.)
The cotton pickers were identified to the contract in Arkansas when the buyer accepted them. Title passed to the buyer, and the buyer undertook the transportation to Louisiana. The Court held that the contract was completed and became mutually binding in Arkansas, and so the Court applied Arkansas law in interpreting the contracts.
In Williams v. Travelers Insurance Co., 19 So.2d 586, 588 (La.App.1944), the court had to decide whether an employment contract was a Louisiana or a South Carolina contract. The employee had been in South Carolina when he accepted the offer of employment over the telephone. The court concluded that it should be guided by the intent of the parties. It had to consider, therefore, the place of the contract’s making, the place of the contract’s performance, and all the facts and circumstances of the ease. The court concluded that the parties’ intent was that the contract be considered a Louisiana contract, and held accordingly.
In Caldwell Company v. Deschanel International Corp., 6 La.App. 802 (1927), a Minnesota corporation sent a telegram to a Louisiana buyer offering to sell a certain amount of flour. The buyer accepted the offer in a letter confirming the contract and setting forth the terms of the sale. Acceptance, therefore, occurred in Louisiana. The contract called for the goods to be shipped “FAS New Orleans”. The seller, as in the present case, was to pay the freight to New Orleans, remain responsible for the goods, and retain control and dominion over the goods until they arrived and were delivered in New Orleans at ship-side. When a New York shipping company sued the Louisiana purchaser for the balance remaining due on a shipment of flour, and the Minnesota seller intervened asserting a vendor’s privilege, the court held that the contracts were Louisiana sales because the last steps in the completion of the sale were to be performed in Louisiana. The court recognized a Louisiana vendor’s privilege in favor of the Minnesota corporation. See also American Slicing Machine Co. v. Rothschild & Lyons, 12 La.App. 287, 125 So. 499 (1929) (Machine was shipped by Illinois company from Indiana to Louisiana for use in that state by a Louisiana resident. Since the principal acts necessary to effect the objects of the contract must have been done in Louisiana, the court applied Louisiana law.)
Thus, the various factors considered by these courts in determining the site of a contract have included the place of acceptance of the offer, the place where the contract became mutually binding on both parties, the place where the parties intended *166 the contract to be made, and the place where the last acts necessary to complete the sale were accomplished.
In this case the bankruptcy court found that of the five contracts, two were accepted in Louisiana, and one was accepted in Georgia. It could not determine where the remaining two contracts were accepted. Those findings are not clearly erroneous. Neither is the finding that Clark had the right to inspect the pipe upon delivery in New Orleans, and to reject it if not satisfied. Because Clark had the right to reject the pipe, the contracts contained a suspensive condition under Louisiana law and were not mutually binding until Clark accepted the goods in New Orleans. That fact supports the bankruptcy court’s conclusion that Mitsubishi and Clark intended the contracts to be perfected in Louisiana, where the last acts necessary to complete the sale, delivery, inspection, and acceptance of goods, occurred. Although Louisiana law does not provide a clear cut test for determining when a contract or sale is a Louisiana contract or sale, we find that the factors considered in prior case law support the holding that the contracts in this case are Louisiana contracts. Even though one of the contracts was accepted in Georgia and it was not determined where two of the other contracts were accepted, we find the other factors together are more important than the place of acceptance by itself.
Associates argues that the sales were not executory sales since Mitsubishi identified the goods to the contracts when identification numbers were placed on the pipes at the steel mills in Japan. We are not persuaded by Associates’ argument since the identification numbers were placed on the pipes for Mitsubishi’s convenience and before Mitsubishi actually received title to the pipes. Mitsubishi received title to the pipes once they were placed on board ship. Apparently, Mitsubishi did not itself identify or segregate the goods until they were cleared through customs in New Orleans. It was at that time that the goods were separated into various groups for removal by customers of Mitsubishi. Only thereafter, when Clark accepted delivery of the pipes, were the contracts executed.
Associates also relies on the “CIF” notation on two of the invoices from Mitsubishi to Clark as evidence that those contracts, at least, were perfected outside of Louisiana, either when the goods were identified by numbers placed on them at the steel mill, or when they were placed on board ship in Japan. Appellant argues that “CIF” indicates that title to the goods passed from Mitsubishi to Clark when the goods were delivered to the carrier for shipment. Appellant ignores the fact that the insurance on those shipments was taken out by Mitsubishi Corporation Tokyo and was assigned by Mitsubishi Corporation Tokyo to Mitsubishi, indicating that Mitsubishi was the owner and the party at risk during shipment. Further, we emphasize that Mitsubishi paid for customs, insurance, and freight charges, and that Mitsubishi was at risk for loss until the goods arrived in Louisiana.
These facts lead to the conclusion that Mitsubishi had title to the goods until they were delivered to Clark, not that title passed immediately from Mitsubishi Corporation Tokyo, through Mitsubishi, to Clark. The notation “CIF” on the invoices may be readily explained as an indication that the price charged Clark would reflect the fact that Mitsubishi paid Mitsubishi Corporation Tokyo for customs, insurance, and freight charges, or even as an observation of the fact that the goods were shipped CIF from Mitsubishi Corporation Tokyo to Mitsubishi. Because the “CIF” notation appears on the first invoice in the context “Unit prices are CIF,” and on the second invoice under the “price” column, the former possibility appears likely, and renders Associates’ argument regarding the passing of title less than persuasive.
IV. REACH OF VENDOR’S PRIVILEGE
Associates suggests that even if the contracts are held to be Louisiana contracts, a vendor’s privilege should not be granted as *167 to two of the contracts because Mitsubishi failed in its burden of proving which pipe under each contract had been paid for and which pipe had not.[5] As we understand Associates’ argument, if there were ten lengths of pipe, all stamped “x” to indicate that they were sold under contract x, and the invoice for contract x had been half paid, Mitsubishi would not be entitled to a vendor’s privilege on any of the pipe stamped with an “x” unless Mitsubishi could specifically identify which five lengths of pipe had been paid for and which had not. We find that contention unrealistic, particularly when one considers that partial payment cannot with certainty be said to pay for some part of a shipment in its entirety and not at all for the rest of the shipment. Much more commonly it obviously is intended to pay partially for the shipment as a whole.
In De La Vergne Refrigerating Machine Company, supra, the contract at issue was for two cotton presses, one of which had apparently been paid for in full, and the other of which had not been paid for. The court wrote:
[I]n as much as the contract was one contract for two compresses, and their erection at a stipulated price in globo for the two, upon which price $48,000 has been paid, leaving due a balance of $32,-000 the vendor’s privilege is considered as extending to and operative upon both presses.
51 La.Ann. 1733, 26 So. 455, 459 (1899).
In their pretrial stipulations, Mitsubishi, Clark, and Associates agreed that there were five separate stacks of pipe in Clark's possession which had been identified by numbers on the pipes. They further agreed upon which contracts related to the various pipes, and how much of the purchase price was outstanding on each invoice. We hold that the vendor’s privilege for each contract extended to all of the pipe identified as purchased under that particular contract, up to the value of the amount owed, as security for the amount due on each contract.
V. PRIORITY OF A VENDOR’S PRIVILEGE
Associates’ final argument is that even if a vendor’s privilege is granted for each contract, Associates’ inventory chattel mortgage primes a vendor’s privilege since it adequately describes the inventory so as to give notice of the mortgage to vendors. Whether the inventory is adequately described is irrelevant since Louisiana law gives a vendor’s privilege priority over an inventory chattel mortgage. See Arenson International, Inc. v. Shelving Systems Corp., 369 So.2d 1212 (La.App.2d Cir.1979).
VI. CONCLUSION
The district court was within the bounds of its discretion when it applied the “clearly erroneous” standard in reviewing the findings of the bankruptcy court. Because we agree with the district court that the bankruptcy court’s findings were not clearly erroneous and that Louisiana law was properly applied as to those findings of fact, we affirm the judgment of the district court.
AFFIRMED.

. La.Civ.Code Ann. art. 3186 (West 1973) defines a privilege as "a right, which the nature of a debt gives to a creditor, and which entitles him to be preferred before other creditors, even those who have mortgages.” Louisiana’s vendor’s privilege, or lien, statute, La.Civ.Code Ann. art. 3227 (West 1973), states in part that:
He who has sold to another any movable property, which is not paid for, has a preference on the price of his property, over the other creditors of the purchaser, whether the sale was made on a credit or without, if the property still remains in the possession of the purchaser.

. The Bankruptcy Reform Act of 1978, Pub.L. 95-598, November 6, 1978, 92 Stat. 2549, repealed the former Bankruptcy Act of 1898 and replaced that Act with the Bankruptcy Code, Title 11 of the United States Code, effective October 1, 1979.

. The Bankruptcy Reform Act of 1978 had been made effective on October 1, 1979.

. We note that in Associates' brief to the district court it argued only that the bankruptcy court’s findings were “clearly erroneous." It did not suggest that a de novo review should be made.

. Associates refers specifically in its argument to contracts 417 and 442. The pretrial stipulations indicate that $27,282.17 is outstanding on contract 417, and $166,920.08 is outstanding on contract 442. While some pipes could not be identified because they were stacked so that the identifying numbers were not visible, the parties agreed to move the pipes to further identify them.