West India Oil Company (P.R.), demandante y apelada, *v.* Rafael Sancho Bonet, Tesorero de Puerto Rico, demandado y apelante.

Núm. 7606.—*Sometido:* Abril 20, 1938.   *Resuelto:* Mayo 10, 1939.

Hon. Procurador General *B. Fernández García* y *E. Córdova Díaz, Procurador General Auxiliar,* abogados del apelante; *James R. Beverley, R. Castro Fernández* y *J. López Baralt,* abogados de la apelada.

El Juez Asociado Señor Travieso emitió la opinión del tribunal.

Esta acción fué instituída de acuerdo con las disposiciones de la Ley núm. 47 de abril 25 de 1931 (pág. 379), con el propósito de obtener una sentencia declaratoria de los derechos de ambas partes litigantes.

La demandante, West India Oil Company (P. R.), es una corporación doméstica que se dedica al negocio de importación, compra y venta de petróleo y otros productos derivados del mismo. En relación con dicho negocio y para hacer más fácil el despacho y entrega de tales productos a sus compradores, la demandante estableció en la ciudad de San Juan, Puerto Rico, de acuerdo con las leyes federales (46 Stat. 743; 19 U.S.C.A., sección 1555), un tanque de depósito bajo fianza (*bonded tank*) para recibir y depositar en el mismo aceite de combustión (*fuel oil*) traído del extranjero a Puerto Rico. El aceite así depositado permanece en el tanque por un período de tiempo indeterminado hasta que es (*a*) reexportado a un país extranjero; o (*b*) entregado a los vapores que lo compran para usarlo en la propulsión de sus máquinas; o (*c*) entregado a sus compradores para uso y consumo en Puerto Rico. Mientras permanece en el tanque de depósito, el aceite está bajo el control del Servicio de Aduanas del Gobierno Federal.

Desde diciembre de 1932 hasta agosto de 1935 la corporación demandante extrajo del mencionado tanque de depósito alrededor de 46,000,000 de galones de aceite de combustión y los entregó a los vapores que lo habían comprado para usarlo en sus viajes al Continente y a países extranjeros.

El Tesorero de Puerto Rico sostiene que el aceite así entregado a dichos vapores en Puerto Rico está sujeto a una contribución de 2 por ciento ad valórem, la que asciende en el presente caso a $26,500, más o menos. Y para imponerla se ampara en las disposiciones de la sección 62 de la Ley de Rentas Internas de Puerto Rico, según quedó enmen-

dada por la Ley número 17 de junio 3 de 1927 (pág. 459), la que transcribimos a continuación:

"Sección 62.—Se impondrá y cobrará, por una sola vez, sobre las ventas de cualesquiera artículos objeto de comercio, que no estén gravados en la sección 16 de esta Ley, o exentos de contribución según lo dispuesto en la sección 83 de la misma, *al tiempo de verificarse la venta en Puerto Rico,* una contribución del dos (2) por ciento sobre el precio o valor de las ventas diarias, *bien de contado o bien a crédito* de dichos artículos, la cual contribución deberá pagar al final de cada mes *la persona que haya efectuado dichas ventas."* (Bastardillas nuestras.)

Sostiene la compañía demandante que la sección 62, supra, no es aplicable al aceite extraído del tanque y entregado a los vapores, por las razones siguientes:

1ª. Porque dicho aceite nunca entra en Puerto Rico ni viene a confundirse con la propiedad del territorio, por ser el tanque algo equivalente a una *zona franca,* fuera del control del Gobierno Insular y bajo el control exclusivo del Gobierno Federal, no estando dicho aceite nunca al alcance de las leyes contributivas de Puerto Rico.

2ª. Porque la contribución que así se trata de imponer sería una contribución sobre exportaciones, prohibida por la sección 3 de la Carta Orgánica de Puerto Rico.

3ª. Porque dicha contribución constituye una carga directa sobre el comercio interestadual y extranjero, cuya imposición está fuera de las facultades de la Legislatura Insular.

4ª. Porque el aceite de combustión estaba todavía en el curso del comercio extranjero al tiempo de ser entregado a los barcos para uso en alta mar.

La Corte de Distrito de San Juan resolvió que el aceite en cuestión nunca había adquirido un *situs* tributable en Puerto Rico y en consecuencia dictó sentencia a favor de la demandante. Apeló el demandado. Señala como errores específicos de la corte inferior el haber sostenido como válidas cada una de las cuatro razones aducidas por la compañía demandante en contra de la imposición de la contribución;

y como quinto error, el de haber condenado al demandado al pago de las costas.

Como complemento de la relación de hechos que antecede, haremos constar que según la declaración del Sr. Lee, segundo jefe de la compañía demandante, los contratos para la venta del aceite se firman en Nueva York entre la Compañía de Vapores y la Standard Oil Company of New York, la cual da aviso de haberse firmado tales contratos a la compañía demandante y ésta entrega el aceite en Puerto Rico a cualquier barco perteneciente a la compañía compradora que lo solicite. Declaró además el Sr. Lee que cuando hay que hacer una entrega de aceite ellos avisan a la Aduana; que ésta inspecciona las válvulas del tanque para ver si el precinto no ha sido roto y supervisan la entrega y la cantidad entregada; que las facturas y los pagos se hacen en New York; que cuando el aceite viene de Aruba no se indica en ningún sitio la cantidad destinada al consumo local, ni la que ha de ser entregada a los barcos, ni la que ha de ser reexportada, sino que viene todo englobado y así se deposita en los tanques; que los tanques están situados en el barrio de Puerta de Tierra, en San Juan; que cuando se hace una entrega de aceite a los barcos *el contrato de venta se celebra en New York, pero la entrega del aceite se hace en San Juan.*

█■ La corte inferior al decidir el caso aceptó como doctrina legal indiscutible la contención de la compañía demandante de que un tanque de depósito bajo fianza, perteneciente como en este caso a una compañía privada, se convierte en zona franca o zona federal y como tal fuera del control o jurisdicción del Gobierno Insular, por el mero hecho de que empleados del Gobierno Federal supervisan e inspeccionan la entrada y salida del aceite combustible. Y habiendo adoptado dicha doctrina, el juez sentenciador se expresó así:

"Los tanques de adeudo (*bonded warehouses*), están bajo el control del Gobierno Federal. Esto no admite discusión y así lo acepta el demandado. Es claro que mientras el aceite de combustión esté en un tanque de adeudo, no está sujeto a contribución alguna por el

territorio de Puerto Rico. . . . . Ya hemos visto por lo anterior, que para que la contribución pueda tener eficacia es necesario que la materia objeto de la contribución esté dentro de la jurisdicción insular. Mientras el objeto de comercio no se confunda con la propiedad del contribuyente en el territorio de Puerto Rico, el mismo está fuera de la jurisdicción. . . . El mero hecho de que el tanque de adeudo esté dentro de nuestras aguas territoriales, no quiere decir que tenga nuestra legislatura jurisdicción para imponer una contribución sobre mercadería depositada en dichos tanques. Ni tampoco creemos que por el hecho de estar allí haya adquirido un *situs* contributivo que permita al Gobierno de Puerto Rico imponerle contribución.''

Examinemos la jurisprudencia citada por el tribunal inferior en apoyo de su resolución.

En el caso de *Surplus Trading Co.* v. *Cook*, 281 U. S. 647, 74 L. ed. 1091, el Estado de Arkansas impuso contribuciones a un número de frazadas de lana que la corporación Surplus Trading Co. compró al Gobierno de Estados Unidos y que estaban depositadas en los almacenes del ejército en ''Camp Pike.'' Se negó dicha corporación a pagar la contribución basándose en que ''la propiedad personal sobre la cual se imponía estaba situada en Camp Pike—una estación militar de movilización, entrenamiento y suministros de los Estados Unidos situada dentro de los límites exteriores de Pulaski County—cuyos terrenos habían sido comprados por los Estados Unidos, con el consentimiento de la Legislatura del Estado, con el propósito de establecer, construir y mantener tal estación militar; y en que las leyes contributivas del estado no podían aplicarse a propiedad así situada, por oponerse a ello el artículo 1, párrafo 8, cláusula 17, de la Constitución Federal, que confiere al Congreso jurisdicción exclusiva sobre los terrenos comprados por el Gobierno Federal con el consentimiento de la legislatura estadual, para la construcción de fuertes, almacenes, arsenales, muelles y otros edificios necesarios. Al resolver que la contribución impuesta en este caso era ilegal, el Tribunal Supremo Federal se expresó así:

"No es poco usual que los Estados Unidos posean dentro de un estado tierras que están destinadas a y son usadas para fines públicos. *Tal posesión y uso por sí solos no bastan para excluir dichas tierras de la jurisdicción del estado.* Por el contrario, las tierras continúan siendo parte de su territorio y dentro del radio de aplicación de sus leyes con la salvedad de que éstas no pueden afectar el título de los Estados Unidos, ni obstaculizarle en el uso de las tierras, ni interferir en su derecho a enajenarlas."

El caso fué decidido a favor de la compañía por el hecho de que Camp Pike es una reserva militar establecida en tierras compradas por el Gobierno Federal con el consentimiento de la Legislatura de Arkansas. Pero refiriéndose a las reservas militares establecidas en tierras adquiridas sin tal consentimiento estadual, el tribunal dijo:

"Si hubiese propiedad privada dentro de tal reserva, que no sea poseída o usada como un incidente del servicio militar, puede ser obligada a pagar contribución al igual que cualquiera otra propiedad privada dentro del Estado."

Es evidente, pues, que la jurisdicción federal excluye la autoridad y jurisdicción estadual solamente cuando las tierras han sido adquiridas por el Gobierno Federal para uno de los fines enumerados en el artículo 1 de la Constitución, supra, y la legislatura del estado ha otorgado su consentimiento para la cesión y renuncia de su jurisdicción. Véanse: *Commonwealth* v. *Clary,* 8 Mass. 72; *Mitchell* v. *Tibbetts,* 17 Pick 298; *U. S.* v. *Cornell,* 2 Mason 60, Fed. Cas. Núm. 14,867; *State ex rel. Jones* v. *Mack,* 62 Am. St. Rep. 811; *Ft. Leavenworth R.R. Co.* v. *Lowe,* 114 U. S. 525; *U. S.* v. *Unzeuta,* 281 U. S. 138, 74 L. ed. 761.

En el otro caso citado por la corte inferior, *Standard Oil Co.* v. *California,* 291 U. S. 242, 78 L. ed. 775, el Estado de California trató de aplicar el estatuto que imponía a todo distribuidor una contribución sobre cada galón de gasolina "vendido y entregado por él en este Estado," a cierta cantidad de gasolina vendida y entregada por Standard Oil Co. al Post Exchange dentro del Presidio de San Francisco. La

Corte Suprema del Estado sostuvo la validez de la. imposición. El Tribunal Supremo Federal revocó la sentencia, diciendo:

"Considerando estas opiniones, parece claro que por la Ley de 1897 California renunció a toda posible reclamación de su derecho a ejercitar autoridad legislativa dentro del Presidio—colocó esa área fuera del campo de operaciones de sus leyes. Por consiguiente, su Legislatura no podía imponer una contribución sobre transacciones comenzadas y consumadas dentro de esa área."

"Un Estado no puede legislar efectivamente sobre materias que están fuera de su jurisdicción y dentro de territorio sujeto solamente al control de los Estados Unidos."

Véase: Annotation, 74 L. ed. 761.

En *U. S.* v. *Unzeuta,* supra, se trataba de un asesinato cometido en un vagón de ferrocarril dentro de los límites de la Reserva Militar de Fort Robinson en el Estado de Nebraska. La Corte Suprema sostuvo la jurisdicción exclusiva del tribunal federal, expresándose por voz de su Juez Presidente Hughes como sigue:

"Cuando los Estados Unidos adquieren título sobre tierras, las cuales son compradas con el consentimiento de la Legislatura del Estado dentro del cual están situadas, 'para la construcción de fuertes, almacenes, arsenales, muelles y otros edificios necesarios' (Const. Art. 1, párr. 8), la jurisdicción Federal es exclusiva de toda autoridad estadual. Con referencia a tierras adquiridas en otra forma, esta Corte dijo en *Fort Leavenworth R. R. Co.* v. *Lowe,* 114 U. S. 525, que la regla aplicable es distinta, y es la de que las tierras y los edificios construídos sobre las mismas para uso del gobierno nacional estarán libres de toda intervención y jurisdicción por parte del estado que pueda menoscabar el uso efectivo de los mismos para los fines para los cuales la propiedad fué adquirida."

Véase: *El Pueblo* v. *Suárez,* 51 D.P.R. 903.

Después de estudiar detenidamente los casos arriba citados, nos vemos obligados a rechazar por insostenible la contención de que un tanque de adeudo perteneciente a y construído por una compañía privada sobre terrenos de su propiedad, situados en Puerto Rico, es una zona franca o

**740**

propiedad federal, sobre la cual carece en absoluto de jurisdicción la legislatura insular, por el solo hecho de que los empleados de la aduana controlan e inspeccionan el movimiento del aceite de combustión depositado en dicho tanque para facilitar el negocio de la compañía.

La cuestión que tenemos que considerar y resolver en el presente caso no es la de si la legislatura insular está o no facultada o tiene o no jurisdicción para imponer una contribución al aceite de combustión mientras éste permanece depositado *in bond* en los tanques de la West India Oil Company. No encontramos en la demanda de dicha compañía alegación alguna al efecto de que el Tesorero Insular haya tratado de imponer tal contribución. La cuestión que tenemos ante nos puede plantearse así:

¿Está legalmente autorizado el Tesorero de Puerto Rico para imponer y cobrar la contribución del 2% que provee la sección 62, supra, sobre el precio del aceite de combustión que la corporación demandante se comprometió a vender por contrato firmado en Nueva York y que entregó en el muelle en Puerto Rico, bombeándolo a los tanques de los vapores de las compañías compradoras?

La contribución a que se refiere la sección 62, supra, es una contribución sobre ventas (*excise tax*) que el Tesorero de Puerto Rico está obligado a imponer y cobrar, por una sola vez, sobre la venta de cualesquiera artículos objeto de comercio. *Flores Álvarez & Cía.* v. *Gallardo,* 36 D.P.R. 117. De acuerdo con dicho estatuto, la referida contribución es imponible y cobrable "al tiempo de verificarse la venta en Puerto Rico." Y es de la interpretación que demos a la frase "al tiempo de verificarse la venta en Puerto Rico" que depende la solución del problema jurídico que se nos ha planteado y que pasamos a resolver.

Sentaremos como premisa indiscutible la de que el aceite de combustión es un artículo objeto de comercio, cuya venta, en el caso de que ésta se verifique en Puerto Rico, está sujeta al pago de la contribución. Y si la otra premisa, o sea la

de que la venta del aceite en cuestión se verificó en Puerto Rico, quedase igualmente establecida, tendríamos que llegar a la conclusión inevitable de que el Tesorero procedió correctamente al aplicar a ella el estatuto.

Sostiene la corporación apelada que habiéndose firmado el contrato de venta, extendido las facturas y pagado el precio en Nueva York, la venta del aceite debe ser considerada como *verificada* en Nueva York y no en Puerto Rico; y que el hecho de que en el momento de concertarse la venta el aceite estuviese en Puerto Rico, donde se hizo la entrega al comprador, no autoriza al Tesorero a imponer la contribución de 2 por ciento sobre tal venta.

Arguye en contrario el Tesorero apelante que a los efectos contributivos una venta *se verifica* en el sitio donde se efectúa la entrega de la cosa vendida, careciendo de importancia el sitio donde se firme el contrato o se pague el precio estipulado.

La corporación demandante no ha tenido a bien someter a nuestra consideración copias de los contratos celebrados en Nueva York entre ella y las compañías de vapores. Ni siquiera se ha hecho referencia a dichos contratos en la petición enmendada. El hecho de la existencia de tales contratos surgió por primera vez de la declaración del Sr. Lee, a la que ya hemos hecho referencia. Y si aceptamos esa declaración en su totalidad, lo único que podemos extractar de ella es que se trata de simples contratos, concertados y firmados en Nueva York, para la venta de ciertas cantidades de aceite de combustión situado en Puerto Rico, que habría de ser extraído de los tanques de la compañía, medido y entregado en el muelle en Puerto Rico a los vapores de los compradores cuando éstos lo solicitaren.

No tenemos duda alguna en cuanto a que los contratos entre la compañía petrolera y las compañías navieras quedaron perfeccionados desde el momento en que fueron firmados en Nueva York, habiendo convenido las partes contratantes en la cosa objeto del contrato y en el precio, sin

necesidad de la previa entrega de la una o del otro. Artículo 1339 del Código Civil, ed. 1930. El convenio en cuanto a la cosa y al precio es suficiente para constituir un contrato de venta válido y obligatorio entre comprador y vendedor, teniendo acción el primero para exigir la entrega de la cosa vendídale, y el segundo para reclamar el pago del precio convenido.

Pero no se trata aquí de determinar y fijar los derechos y obligaciones entre el vendedor y el comprador y sí de la obligación que con un tercero, el estado, contrae todo vendedor que *verifica* una venta de un objeto de comercio dentro de los límites del estado.

Manresa, en sus Comentarios al Código Civil Español, al tratar sobre *la perfección* y *la consumación* del contrato de venta, se expresa así:

"Desde que se consiente, y sin necesidad de ninguna otra circunstancia, el contrato, repetimos, está perfecto y nacen las obligaciones; pero la transmisión de la propiedad no existe hasta que la cosa no ha sido entregada. La entrega de la cosa se refiere al período de consumación; en el artículo que estudiamos se trata tan sólo de fijar el momento de la perfección."

Dijimos que la tendencia más generalmente admitida afirmaba la doctrina de la transmisión de la propiedad por el mero consentimiento y sin necesidad de la previa tradición, y que, *por el contrario, nuestro Código continuaba exigiendo ese requisito para que la propiedad se entendiese transmitida.* (Bastardillas nuestras.) 10 Manresa, pág. 60, 2da. edición.

Y el Comentarista Scaevola dice:

"Todas esas consideraciones nos llevan por la mano a declarar en su consecuencia *que la transmisión del dominio de la cosa vendida del vendedor al comprador, se opera en el momento mismo en que el contrato se ha consumado, no cuando se perfecciona simplemente;* etc." (Bastardillas nuestras). 23 Scaevola 318.

Igual doctrina ha sostenido este Tribunal Supremo en *Olivari* v. *Bartolomei,* 2 Sentencias del Tribunal Supremo de Puerto Rico 79; *Capó* v. *Santiago A. Panzardi & Co.,* 44

D.P.R. 232; y *Benítez Flores* v. *Llompart,* 50 D.P.R. 670. Véase: artículo 549 del Código Civil, ed. 1930.

La jurisprudencia estadual se pronuncia en el mismo sentido:

"El contrato para las prensas, aun cuando fué otorgado en Nueva York, debía ser cumplido y consumado en Louisiana. . . . . Las prensas y sus equipos continuaban siendo propiedad del demandante (vendedor) y a su riesgo hasta que fuesen así probadas y aceptadas. Por esa razón la entrega de las prensas debía hacerse aquí. El contrato por lo tanto debe ser considerado como un contrato de Louisiana, y las prensas afectas al gravamen que nuestras leyes reconocen a favor del vendedor." *De la Vergne Ref. Mach. Co.* v. *New Orleans & W. R. Co.,* 26 So. 455. Véase: 16 So. 764.

"Una venta se considera como hecha en el sitio en que se lleva a efecto mediante la transmisión de la propiedad del vendedor al comprador." 55 C. J. 213.

Véanse: *Fred Miller Brewing Co.* v. *De France,* 57 N. W. 959; *Weil* v. *Golden,* 141 Mass. 364, 6 N. E. 229.

"Por consiguiente, en ausencia de un convenio de las partes o de algunas circunstancias especiales en contrario, si se da una orden para ciertos artículos y la orden es aceptada mediante la entrega de los artículos a un porteador para ser embarcados con la intención de transmitir el derecho de propiedad sobre los mismos al comprador, *el lugar del embarque es el lugar de la venta, por cuyas leyes debe regirse dicha venta.* 55 C. J. 213. (Bastardillas nuestras.)

Véanse: *Peo.* v. *Hill Top Metals M. Co.,* 133 N. E. 303. *Peo.* v. *Young,* 237 Ill. 196, 86 N. E. 589. *City of Carthage* v. *Duvall,* 202 Ill. 234, 60 N. E. 1099. *Phoenix Packing Co.* v. *Humphrey Ball Co.,* 108 Pac. 952. *Claflin* v. *Mayer,* 41 La. Ann. 1048, 7 So. 139.

En el caso de autos el título o derecho de propiedad no podía ser transmitido al comprador hasta que el aceite fuese extraído del tanque, medido y entregado a los vapores.

"La aceptación de una orden de entrega no transferirá la propiedad si queda algo por hacer, tal como pesar o medir, para identificar los bienes o determinar la cantidad vendida." 55 C. J. 562. Véanse páginas 530–542.

Véanse: *Iron City Grain Co.* v. *Arnold,* 215 Ala. 543, 112 So. 123. *López & Morán* v. *Sobrinos de Ezquiaga,* 34 D.P.R. 79.

De acuerdo con las autoridades citadas debemos llegar a la conclusión de que el contrato o promesa de venta celebrado en Nueva York no quedó consumado hasta que el aceite fué extraído del tanque, medido y entregado a los vapores en sus tanques.

Arguye la compañía demandante que al disponer que la contribución sobre ventas se impondrá y cobrará "al tiempo de verificarse la venta en Puerto Rico," la intención del legislador fué la de imponer y cobrar el tributo en el momento de la celebración o perfección del contrato de venta y no en el momento de su consumación por la entrega de la cosa vendida.

En el Diccionario de la Lengua Española, 1936, encontramos las siguientes definiciones:

VERIFICAR—(Del latín, *verus,* verdadero y *facere,* hacer). 3. Realizar, efectuar.

EFECTUAR—(Del latín, *effectus,* efecto). Poner por obra, ejecutar una cosa.

REALIZAR—Verificar, hacer real y efectiva una cosa.

CONSUMAR—Llevar a cabo de todo en todo una cosa.

Es evidente que los verbos "verificar," "efectuar," "realizar" y "consumar" son todos expresivos de la misma idea o concepto: la ejecución o consumación de un acto.

Somos, pues, de opinión y así lo resolvemos que al disponer en la sección 62, supra, que la contribución de 2 por ciento se impondrá y cobrará "al tiempo de *verificarse* la venta en Puerto Rico" y que dicha contribución deberá pagarla "la persona que haya *efectuado* dichas ventas," el legislador tuvo la intención y el propósito de imponer el tributo en el sitio y en el momento de la consumación de la venta por la entrega al comprador de la cosa vendida, sin tener en consideración la forma de pago del precio toda vez que la contribución es aplicable a todas las ventas "bien de contado o bien a crédito." El sostener lo contrario haría muy fácil la evasión del pago de contribución de venta tanto en New York como en Puerto Rico, toda vez que las cortes

de aquel estado han resuelto que no se puede imponer la contribución cuando la cosa objeto del contrato se entrega fuera de la ciudad de Nueva York, aun cuando el contrato de venta se firme o perfeccione dentro de dicha ciudad. *United Artists Corporation* v. *Taylor,* 7 N. E. (2d) 254, 273 N. Y. 334, confirmando 248 App. Div. 207.

■ 2. La contención de la corporación demandante de que la contribución que el Tesorero trata de imponer al aceite entregado a los vapores es una contribución sobre las exportaciones, prohibida por la sección 3 de la Carta Orgánica de Puerto Rico, es a nuestro juicio insostenible.

"Exportar" significa enviar efectos y mercancías de un país a otro. "Exportación" (*export*) como nombre significa la cosa exportada. Según se usa en la Constitución y en las leyes de Estados Unidos, generalmente, la transportación de efectos desde este país a un país extranjero. El término "exportación" aparece así definido en la obra Corpus Juris:

"La separación de bienes de la masa de cosas pertenecientes a este país con la intención de unirlos a la masa de cosas perteneciente a algún país extranjero; el acto de llevar o enviar mercancía al extranjero; . . . . . " 25 C. J. 216.

En *Swan, etc. Co.* v. *U. S.,* 190 U. S. 143, 47 L. ed. 984, se dijo:

"No puede significar simplemente el acto de sacar fuera del país . . . Ni el mero hecho de que no existía el propósito de volver justificaría el uso de la palabra *export*. Carbón colocado en un vapor en San Francisco para ser consumido en propulsar el vapor hasta San Diego nunca sería así designado. Otro país o estado como punto de destino de la mercancía es esencial a la idea de exportación."

■ 3. La corporación demandante ha invocado la protección de la cláusula comercial (*commerce clause*) de la Constitución Federal, alegando que la contribución que el Tesorero trata de imponer y cobrar sobre el aceite entregado en Puerto Rico a los vapores "constituye una carga directa sobre el comercio interestadual y extranjero, y como

tal la legislatura de Puerto Rico carece de facultad para imponerla.''

Hemos examinado la jurisprudencia federal sobre la materia, con el siguiente resultado.

En *Kelley* v. *Rhoads*, 188 U. S. 1, 4 L. ed. 359, el demandante se encontraba transportando su rebaño de ovejas desde el Territorio de Utah hasta el Estado de Nebraska, atravesando el Estado de Wyoming. Mientras atravesaban dicho Estado, las ovejas pastaban en los campos que encontraban en su camino. El Estado de Wyoming impuso y cobró al demandante una contribución de acuerdo con un estatuto que disponía que todo el ganado que fuese traído al estado con el propósito de pastar en sus campos debería pagar contribución por el año fiscal durante el cual ingresó en el estado. El demandante invocó la protección de la cláusula comercial, alegando que las ovejas estaban en Wyoming, *in transitu,* como parte del comercio interestadual, y no estaban sujetas a tributación. La Corte Suprema así lo resolvió, y en su opinión, después de examinar la jurisprudencia anterior, dijo:

''La ley sobre esta materia, en cuanto se refiere a la interferencia con el comercio interestadual, ha quedado establecida por varios casos ante esta Corte, los que sostienen que la propiedad que está actualmente en tránsito está exenta de contribución local, aun cuando si fuere depositada por un tiempo indefinido durante tal tránsito, por lo menos por causas que no sean naturales o falta de facilidades para su inmediata transportación, puede ser sometida a tributación por las autoridades locales. (Citas.)

.   .   .   .   .   .   .   .   .

''La substancia de estos casos es que, mientras la propiedad está estacionada por tiempo indefinido esperando ser transportada, o esperando una venta en el sitio a que va destinada o en algún punto intermedio, está sujeta a contribución. Pero si está actualmente en tránsito hacia otro estado, entonces se convierte en un objeto de comercio interestadual, y como tal exenta de contribución local.''

En *American Steel & Wire Co.* v. *Speed,* 192 U. S. 500, 48 L. ed. 538, la demandante, corporación del Estado de New

Jersey y dedicada a la manufactura de alambre, clavos, etc., en sus factorías en varios estados, con el propósito de facilitar la venta y entrega de sus productos eligió la ciudad de Memphis, en el Estado de Tennessee, como un punto de distribución. Al llegar allí los productos eran depositados en un almacén de una Compañía de Transportes y ésta los entregaba a las personas a quienes los vendía la demandante. El Estado de Tennessee impuso una contribución a dichos productos y la compañía se negó a pagarla, alegando que los productos estaban en Tennessee en tránsito para ser entregados a los compradores y que la contribución que se trataba de imponer estaba en pugna con la Cláusula Comercial de la Constitución Federal. La Corte Suprema Federal sostuvo la validez del impuesto, diciendo:

"Con estos hechos a la vista somos de opinión que la Corte inferior tuvo razón al decidir que los bienes no estaban en tránsito, sino, por el contrario, que habían llegado a su destino en Memphis y estaban allí en depósito a riesgo de la compañía, para ser vendidos y entregados a medida que los contratos para tal fin quedaban completamente consumados."

Véanse: *General Oil Co.* v. *Crain*, 209 U. S. 211, 52 L. ed. 754; *Susquehanna Coal Co.* v. *South Amboy*, 228 U. S. 665; *Bacon* v. *Illinois*, 227 U. S. 504; *State* v. *Maxwell Motor Sales Corporation*, 171 N. W. (Minnesota) 566; 61 C. J. 241.

A nuestro juicio la contribución que el Tesorero trata de cobrar e imponer no está en conflicto con la citada Cláusula de Comercio de la Constitución Nacional.

■■ 4. La cuarta y última contención de la corporación demandante es que "el aceite de combustión estaba todavía en el curso del comercio extranjero al tiempo de ser entregado a los barcos para su uso en alta mar."

Ya hemos hecho constar anteriormente que el Tesorero de Puerto Rico no ha pretendido ni pretende imponer una contribución de venta (*sales tax*) al aceite de combustion mientras éste permanezca depositado en el tanque de adeudo, bajo la supervisión y control de la aduana. Si tal cosa pre-

tendiera, el caso sería fácil de resolver, pues una imposición de esa naturaleza sería una clara contravención del artículo 1, sec. 10, párrafo 3, de la Constitución Federal que prohibe a los Estados la imposición de tributos o derechos sobre importaciones o exportaciones.

La Corte Suprema de Estados Unidos, en el caso de *American Steel & Wire Co.* v. *Speed,* supra, estableció en términos claros la distinción entre las importaciones del extranjero y las que se hacen de un estado a otro, diciendo:

"Desde *Brown* v. *Maryland,* 12 Wheat. 436, 6 L. ed. 684, ha estado fuera de discusión que una contribución impuesta por los estados a los artículos importados, ya sea impuesta directamente a los artículos importados o indirectamente, gravando el derecho a disponer de los mismos, está en pugna con la disposición de la Constitución que provee que 'ningún estado impondrá, sin el consentimiento del Congreso, impuestos o derechos sobre importaciones o exportaciones' (Artículo 1, sec. 10, párr. 3). Y *Brown* v. *Maryland* dejó sentado también que cuando los artículos eran importados ellos conservaban ese carácter, como importaciones, y no estaban por lo tanto sujetos ni directa ni indirectamente a contribuciones estaduales *mientras permanecieran sin ser vendidos en los paquetes originales en que fueron importados.* Un caso reciente que hace referencia a las autoridades y enuncia de nuevo esta doctrina elemental es *May* v. *New Orleans,* 178 U. S. 496, 44 L. ed. 1165, 20 Sup. Ct. Rep. 976. Asumiendo que los artículos sobre los cuales se impusieron en este caso las contribuciones estaduales estaban en los paquetes originales y no habían sido vendidos, si el traer dichos artículos a Tennessee de otro estado constituyó una importación, de acuerdo con la significación constitucional de esa palabra, es claro que no podrían ser ni directa ni indirectamente sometidos a contribución. Pero no habiendo sido dichos artículos traídos del extranjero, no fueron importados en el sentido legal, y estaban sujetos a contribución estadual después de haber llegado a su destino y mientras permanecían depositados en el estado para ser vendidos . . . . . . Los varios estados, por lo tanto, no estando controlados en cuanto a tales mercancías por la prohibición contra la imposición de tributos a las importaciones, se decidió que los estados tenían la facultad, después que los artículos habían llegado a su destino y eran depositados para su venta, para imponerles contribución, sin discrimen, como a cualquiera otra propiedad situada dentro del estado."

La cuestión envuelta en *Brown* v. *Maryland,* supra, era si la legislatura de un estado puede constitucionalmente imponer al importador de artículos extranjeros la obligación de obtener una licencia a un costo de $50, antes de que se le permita vender los artículos así importados. La Corte Suprema, por voz del Juez Presidente Marshall resolvió que dicha licencia era anticonstitucional por ser una contribución sobre importaciones. De la opinión del eminente jurista copiamos lo que sigue:

"Pero, aunque admitimos que los sanos principios de interpretación deben restringir a todas las cortes para no llevar las palabras de la prohibición más allá del propósito que persigue la Constitución, y que debe haber un momento en que la prohibición cesa y el poder fiscal estadual comienza, no podemos admitir que ese momento sea el instante en que los artículos entran en el país. Parécenos obvio que esa interpretación echaría por tierra la prohibición.

"Es suficiente por el presente decir, en general, que cuando el importador ha actuado de modo tal en cuanto a la cosa importada que ésta se ha incorporado y mezclado con la masa de propiedad del país, entonces la cosa ha perdido quizás su carácter distintivo como una importación y ha quedado sujeta al poder fiscal del estado; *pero mientras siga siendo propiedad del importador, en su almacén, en la forma o paquete original en que fué importada, una contribución sobre ella es una contribución sobre importaciones demasiado clara para escapar la prohibición constitucional.* (Bastardillas nuestras.)

Aplicando las reglas establecidas por los casos que hemos citado, a los hechos del presente caso, tenemos inevitablemente que resolver que cuando el importador extrajo del tanque de adeudo un determinado número de galones de aceite y los entregó a un vapor en el muelle en Puerto Rico, para consumar una venta previamente pactada, dicha venta quedó sujeta a la tributación imponible de acuerdo con la sección 62 de la Ley de Rentas Internas, supra; que el aceite así vendido, extraído y entregado por el importador perdió su carácter distintivo como importación, ingresó a Puerto Rico como un objeto de comercio y quedó desde ese momento sujeto

a la jurisdicción fiscal insular (*West India Oil Co.* v. *Gallardo*, 6 F.(2d) 523); que el hecho de que el aceite haya sido entregado a un vapor que ha de consumirlo en sus viajes en el comercio interestadual o internacional no da al aceite el carácter de exportación, toda vez que dicho producto no iba consignado a ningún puerto extranjero o nacional (*Swan & Finch Co.* v. *U. S.*, supra); que la mera compra de suministros o equipos que han de ser usados en un negocio que constituye comercio interestadual no está tan identificada con ese comercio para hacer que la venta esté exenta del pago de la contribución que la ley insular impone por igual sobre todas las ventas verificadas o consumadas dentro de su jurisdicción (*Eastern Air Transport* v. *Tax Comm.*, 285 U. S. 147); y por último, que habiéndose hecho la entrega del aceite en el muelle, en la bahía de San Juan, la venta quedó consumada dentro de la jurisdicción fiscal de Puerto Rico y por tanto sujeta al pago de la contribución del 2 por ciento, la que por su naturaleza es un *excise tax*, un arbitrio y no una contribución sobre la propiedad. *Gromer* v. *Standard Dredging Co.*, 224 U. S. 362.)

No habiéndose invocado la protección de estatuto federal alguno que otorgue a los barcos dedicados al comercio internacional o interestadual el privilegio de poder comprar, o a las compañías petroleras el de poder vender, dentro de los límites de un estado, artículos objeto de comercio, sin tener que pagar los arbitrios (*excises*) locales sobre ventas realizadas dentro de los límites del estado, debemos resolver que la West India Oil Co. está legalmente obligada a pagar la suma exigida por el Tesorero apelante. Sostener lo contrario haría que la ley se convirtiera en discriminatoria en contra de los demás traficantes en el mismo negocio.

*Por las razones expuestas debe revocarse la sentencia recurrida, sin especial condenación en costas.*

El Juez Asociado Sr. Wolf disintió. *

El Juez Asociado Sr. De Jesús no intervino.

---

* Nota: Véase el prefacio.