SPANISH AMERICAN TOBACCO CO., INC., demandante y apelada, *v.* RAFAEL SANCHO BONET, TESORERO DE PUERTO RICO, sustituído por RAFAEL BUSCAGLIA, demandado y apelante.

Núm. 10129.—*Sometido:* Junio 26, 1950. *Resuelto:* Diciembre 29, 1950.

*Hon. Procurador General Vicente Géigel Polanco y J. C. Santiago Matos, Procurador General Auxiliar,* abogados del apelante; *L. E. Dubón y R. García Cintrón,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Más de diez años ha tardado este caso en llegar a este Tribunal después de haberse iniciado en el tribunal inferior el 19 de abril de 1939, en el cual, no obstante haberse contestado la demanda en julio del mismo año, no se celebró el juicio hasta el 12 de diciembre de 1946 y se dictó sentencia el 2 de junio de 1949. Nada encontramos en el récord que justifique tardanza tan inusitada en su tramitación. Los hechos envueltos son los siguientes:

La Spanish American Tobacco Co., Inc., a quien nos referiremos en adelante como la Corporación, allá para los meses de octubre, noviembre y diciembre de 1938, compró a la Puerto Rico Tobacco Marketing Association y a Cosecheros de Tabaco de Utuado, Inc., dos corporaciones cooperativas domésticas, 7,692 quintales de tabaco en rama con el fin de exportarlo a Alemania. El Tesorero de Puerto Rico impuso a la Corporación la contribución autorizada por el artículo 1 de la Ley núm. 151, aprobada el 15 de mayo de 1937 (Leyes de Puerto Rico, 1937, pág. 411),(¹) sobre dichos quintales de tabaco y la Corporación, para evitar que se ejecutaran bienes que fueron embargados por el Tesorero, pagó bajo protesta la suma de $1,325.55, importe de la contribución y de la penalidad, multas e intereses. La Corporación inició esta acción para recobrar dicha suma alegando que no venía obligada al pago de la contribución, entre otros motivos, primero, porque la misma opera como una contribución sobre

(¹) Dicho artículo dispone:

"Se impondrá y cobrará, por una sola vez, sobre todo tabaco que se coseche en Puerto Rico, al tiempo de ser comprado del cosechero, una contribución de 15 centavos sobre cada cien libras o fracción de cien libras de tabaco en rama que se coseche en Puerto Rico, la cual contribución deberá pagar al final de cada mes la persona natural o jurídica que compre dicho tabaco en rama."

la exportación y como tal, es inconstitucional y segundo, porque las corporaciones cooperativas de quienes adquirió el tabaco fueron las primeras compradoras del tabaco vendido a la Corporación, siendo ellas, por tanto, las obligadas a pagar la contribución de acuerdo con el artículo 1 de la Ley núm. 151, supra, ya que no están exentas de dicho pago.

El Tesorero negó los hechos esenciales de la demanda y celebrado el juicio correspondiente, el tribunal inferior dictó sentencia declarando con lugar la demanda por el único fundamento de que, de acuerdo con los hechos que consideró probados, la Corporación adquirió el tabaco de las cooperativas con el fin de exportarlo a Alemania y le fué entregado en el muelle debidamente embalado y listo para su exportación y que dicho tabaco fué efectivamente exportado para Alemania, y en su consecuencia, que la contribución impuesta era nula de acuerdo con la sección 3 del Acta Orgánica y el Artículo 1, Sección 10, Cláusula 2 de la Constitución de los Estados Unidos, que prohiben la imposición y cobro de contribución alguna sobre exportaciones.

El Tesorero apeló y en este recurso alega que el tribunal inferior erró al resolver que la contribución impuesta recae sobre la exportación del tabaco y al no resolver que la demandante venía obligada al pago de la contribución por ser ella la primera compradora.

Es regla firmemente establecida que si un caso puede ser resuelto en sus méritos, sin necesidad de entrar a considerar y resolver cualquier cuestión constitucional planteada, las cortes así deben hacerlo. En otras palabras, las cortes deben considerar y resolver sobre la constitucionalidad de una ley solamente cuando sea indispensable para la determinación de la causa en sus méritos. *Tesorero* v. *Tribl. Contribuciones y Kemper*, 71 D.P.R. 298; *Rescue Army* v. *Municipal Court*, 331 U. S. 549, 569, nota (33); *Alma Motor Co.* v. *Timken Co.*, 329 U. S. 129.

Aplicando esta regla al caso de autos, consideramos que el tribunal inferior erró al resolverlo a base de la cuestión

constitucional planteada por la demandante en cuanto a que la contribución impuesta al tabaco constituía un derecho sobre su exportación, ya que el caso pudo y debió haber sido resuelto a base de la otra cuestión planteada por la demandante, o sea si bajo los términos del contrato de compraventa del tabaco entre el cosechero y las cooperativas, la corporación demandante podía ser considerada como la primera compradora a los efectos del artículo 1 de la Ley núm. 151, supra.

 Como hemos visto, el artículo 1 dispone que la contribución "se impondrá y cobrará, por una sola vez, sobre todo tabaco que se coseche en Puerto Rico, *al tiempo de ser comprado del cosechero*, . . . la cual contribución deberá pagar . . . la persona natural o jurídica que *compre* dicho tabaco en rama." (Bastardillas nuestras.) La contención del apelante al efecto de que la contribución se impone al cosechero por el hecho de cosechar el tabaco, debido a que dicho artículo dice que la contribución se impone "sobre todo tabaco que se coseche en Puerto Rico", es insostenible. No podemos mutilar dicho artículo, separando una frase aislada del mismo, cuando la intención legislativa está claramente expresada en todo su contexto al disponer que la contribución se impondrá "al tiempo de ser comprado del cosechero" y se pagará por "la persona natural o jurídica que compre" el tabaco. El evento tributable no surge al cosechar el tabaco sino por el hecho de comprarlo.

¿Fué la apelada la compradora del tabaco al cosechero y como tal la obligada a pagar la contribución? De hecho no lo fué pues a quienes ella compró fué a las cooperativas Puerto Rico Tobacco Marketing Association y Cosecheros de Tabaco de Utuado, Inc., quienes a su vez lo habían adquirido de los cosecheros. Arguye el apelante, sin embargo, que dichas cooperativas no adquirieron el tabaco de los cosecheros por compra sino que les fué entregado para que como agentes de los cosecheros, lo revendieran. Esto nos lleva a examinar el contrato otorgado entre las cooperativas y los

cosecheros a la luz del artículo 15 de la Ley núm. 70 sobre Ventas Cooperativas aprobada el 4 de agosto de 1925 (Leyes de Puerto Rico, 1925, págs. 369, 385) [2] que autoriza el otorgamiento de estos contratos de ventas entre las cooperativas y sus miembros. [3] En el alegato adicional de la apelada se hace un resumen correcto de las cláusulas de dicho contrato en la siguiente forma:

"El contrato, que se denomina Contrato de Compraventa, consta de 18 cláusulas en adición a la comparecencia. Por la cláusula PRIMERA, el cosechero—miembro o socio de la cooperativa—se obliga a estar y pasar en todo tiempo por las responsabilidades contraídas en el contrato; por la SEGUNDA, la asociación compra, y el cosechero vende a la asociación, y se obliga a entregar a ésta, todo el tabaco producido por él o para él, o adquirido por él o para él como propietario de finca o fincas y/o como arrendatario, arrendador o aparcero, de finca o fincas; por la TERCERA, el cosechero expresamente declara que al momento de la formalización del contrato no ha celebrado con-

[2] El artículo 15 dispone lo siguiente:

"*Contratos de ventas.*—La asociación y sus miembros podrán hacer y ejecutar contratos de ventas requiriendo a los miembros que vendan por un período de tiempo que no excederá de diez años, todos o cualquier parte especificada de sus productos agrícolas o determinados frutos, exclusivamente a la asociación o por su conducto, o por conducto de cualesquiera facilidades que la asociación creare. Si contrataren una venta a la asociación quedará concluyentemente determinado que el título sobre dichos productos pasa absolutamente y sin reservas, excepción hecha de los gravámenes inscritos, a la asociación desde el momento de su entrega, o en cualquiera otra fecha especificada, siempre que estuviese expresa y definidamente convenido en el contrato. El contrato podrá establecer que la asociación estará autorizada para vender o revender los productos entregados a ella por sus miembros, con o sin títulos sobre los mismos, pagando a sus miembros el precio de la reventa, ya sea separada o conjuntamente y real o proporcional, después de deducir todas las costas y gastos necesarios mayores de la venta, incluyendo intereses sobre las acciones preferidas, que no excederá del ocho por ciento al año y la reserva para el retiro de acciones, si las hubiese, así como cualquiera otra reserva correspondiente, más los intereses, que no excederán del ocho por ciento al año, sobre las acciones comunes, o después de realizar cualquiera otra deducción especificada en el contrato."

[3] Las cooperativas en este caso fueron organizadas de acuerdo con las disposiciones de la Ley núm. 70 de 1925, supra. Esta Ley, con algunas variaciones, es igual al *Standard Marketing Act* en vigor en los Estados Unidos y especialmente a la de Texas.

trato de clase alguna de venta o entrega del tabaco objeto del contrato con ninguna otra persona, firma comercial o corporación; pero si las obligaciones contraídas por el cosechero bajo un contrato previo son de la naturaleza de un gravamen refaccionario, o de otra clase, lo cual el cosechero estará en la obligación de declarar a la asociación, el cosechero autoriza a la asociación a pagar al tenedor de dicho gravamen, del producto derivado de la venta del tabaco objeto del contrato, o del montante de los anticipos o préstamos sobre dicho tabaco, el montante de dicho gravamen, antes de hacer pago alguno al cosechero; por la CUARTA, el cosechero se compromete a entregar todo el tabaco objeto del contrato en la fecha más temprana posible después de la recolección a la orden de la asociación, y en el sitio o sitios que la asociación designe. *Esto no obstante, las partes acuerdan que este contrato da título absoluto a la asociación sobre todo el tabaco objeto de este contrato tan pronto como éste tenga una existencia potencial, quedando hasta la entrega bajo la responsabilidad y cuidado del cosechero;* por la QUINTA, cualquier pérdida que sufra la asociación como consecuencia de inferioridad de clase o malas condiciones del tabaco en el momento de la entrega, será cargada al cosechero individualmente; por la SEXTA, la asociación se reserva el derecho de adoptar reglas y reglamentos y de nombrar inspectores, manipuladores y clasificadores para clasificar el tabaco y establecer métodos de clasificación, manipulación, etc.; por la SÉPTIMA, se faculta a la asociación para mezclar el tabaco del cosechero con otros tabacos entregados durante la misma cosecha por otros cosecheros, después de clasificado; por la OCTAVA, la asociación conviene en revender el tabaco entregado por el cosechero junto con el tabaco de otros cosecheros vendido bajo contratos similares a éste, a los mejores precios que se puedan obtener bajo las condiciones del mercado y pagar la cantidad neta recibida de dicha venta al cosechero y a los otros cosecheros que han firmado contratos similares a éste de acuerdo con la cantidad y clasificación hecha por la asociación del tabaco entregado por cada uno, después de deducirse los anticipos y sus intereses, hechos al cosechero, los gastos de almacenaje, clasificación, manipulación, industrialización y venta de dicho tabaco y los gastos de administración de la asociación, así como descuentos para reserva de créditos y otros propósitos comerciales, y cualquiera otra atención a que viniere o estuviere obligada la asociación; por la NOVENA, el cosechero expresamente

conviene y acepta que la asociación podrá, con absoluta discreción, manipular, vender o despalillar todo o parte del tabaco, o usarlo para fines industriales, pero el producto de dicho tabaco en la forma que se vendiere, será prorrateado por los cosecheros en proporción a las entregas y a la clasificación hecha por la asociación; por la DÉCIMA, se faculta a la asociación para vender el tabaco en el mercado local o en el mercado de los Estados Unidos o en el mercado extranjero, directamente a los manufactureros o exportadores, o a través de otras agencias o personas establecidas con el mismo propósito, en el tiempo y forma y bajo las condiciones que mejor convenga a los intereses de los cosecheros y la asociación; por la UNDÉCIMA, se faculta a la asociación para solicitar y obtener préstamos de dinero para cualquier fin de la asociación con la garantía del tabaco entregado a la asociación, y para, con el dinero así obtenido, hacer aquellos anticipos al cosechero sobre el tabaco entregado, como a discreción de los directores de la asociación justifiquen las condiciones del mercado. Por esta misma cláusula se faculta a la asociación para vender o hipotecar por su propia cuenta o en garantía de sus deudas, todo o cualquier parte de su tabaco o conocimiento de embarque, recibos de almacenaje, records de ventas, o cualquier documento en relación con dicho tabaco; por la DUODÉCIMA, se estipula que el convenio obligará al cosechero, mientras produzca tabaco, ya directamente o indirectamente, o mientras tenga algún derecho legal para ejercitar sobre algún tabaco, o mientras tenga algún derecho como cosechero durante la vigencia del contrato; por la DÉCIMOTERCERA, se dispone que si el contrato fuere firmado por los miembros de una sociedad agrícola, o entidad comercial, todos sus términos se aplicarán a cada uno de los socios que integran la sociedad individualmente si dicha sociedad es disuelta por algún motivo; por la DÉCIMOCUARTA y la DÉCIMOQUINTA se establecen los remedios—daños líquidos, injunction, cumplimiento específico de contrato—que tendrá la asociación contra el cosechero si éste faltare al cumplimiento de los términos del contrato; por la DÉCIMOSEXTA se fija la cosecha con que comienza el contrato y se establecen los términos y condiciones en que la asociación y el cosechero podrán cancelar el mismo; por la DÉCIMOSÉPTIMA, las partes convienen en que no existe condición, promesa, convenio o incitación fuera de los términos del contrato y que el mismo representa el Convenio de Compraventa celebrado por las partes; y por la DÉCIMOCTAVA, se provee que en caso de

.muerte del cosechero, los herederos del mismo, sus sucesores o causahabientes, vendrán obligados al cumplimiento del contrato."

Contratos similares a éste han sido interpretados indistintamente como contratos de compraventa, de mandato o de fideicomiso. (⁴) Es de notarse que el artículo 15 de la Ley núm. 70, supra, autoriza a las cooperativas y a los cosecheros a celebrar tanto un contrato de compraventa como uno de agencia, empero las disposiciones del contrato aquí en discusión son a nuestro juicio típicas de uno de compraventa. No sólo por el título que dieron al convenio sino por el contenido del mismo, aparece claramente que la intención de las partes fué que los cosecheros vendieran a las cooperativas y se comprometieran a entregar todo el tabaco producido o adquirido por ellos y acordaron además que el título absoluto sobre el mismo pasaba a las cooperativas tan pronto como el tabaco tuviera una existencia potencial, autorizándose a las cooperativas a mezclar el tabaco entregado por los distintos cosecheros y así mezclado, revenderlo al mayor precio en el mercado y pagar la cantidad neta recibida a los cosecheros después de deducirse cualquier anticipo hecho y sus intereses, gastos de almacenaje y administración, etc. Se provee, además, el pago por los cosecheros a las cooperativas de $5 por cada quintal de tabaco que dejaren de entregar como daños ajustados por incumplimiento del contrato, proveyéndose además que las cooperativas tendrían derecho a obtener un *injunction* prohibiendo a los cosecheros el incumplimiento del contrato en caso de que no entregaren el tabaco y a un decreto exigiendo el cumplimiento específico del contrato. También se faculta a las cooperativas a obtener préstamos para cualquier fin de la asociación con la garantía del tabaco entregado y con el dinero así obtenido

---

(⁴) Véanse *Interpretation of Contracts Employed by Cooperative Marketing Associations*, 43 Yale L.J. 119-127; *The Law of Co-operative Marketing* por Theodore R. Meyer, 15 Cal.L.Rev. 85; *Cooperative Marketing Associations* por Gerard C. Henderson, 23 Col.L.Rev. 91.

hacer anticipos a los cosecheros, autorizándoseles además, a vender o exportar todo o cualquier parte del tabaco.

De acuerdo con el artículo 1334 del Código Civil, ed. de 1930, por el contrato de compraventa uno de los contratantes se obliga a entregar una cosa determinada y el otro a pagar por ella un precio cierto, en dinero o signo que lo represente, siendo bastante para que el precio se tenga por cierto, de acuerdo con el artículo 1337 del mismo código, en la venta de valores, granos, líquidos y demás cosas fungibles, cuando se señale el que la cosa vendida tuviera en determinado día, bolsa o mercado, o se fije un tanto mayor o menor que el precio del día, bolsa o mercado, con tal que sea cierto. Por el contrato los cosecheros se obligaron a entregar y entregaron a las cooperativas su tabaco y éstas convinieron pagar por el mismo el mejor precio obtenible en el mercado, menos los descuentos antes mencionados. Se convino que el título al tabaco pasaría a las cooperativas con la entrega—y aun cuando el tabaco tuviera una existencia potencial, cuestión no envuelta en el presente caso—(5) debiendo pagarse el precio cuando las cooperativas revendieran el tabaco, pacto que es válido bajo el artículo 1339 del Código Civil, que dispone que la venta se perfeccionará entre comprador y vendedor, y será obligatoria para ambos, si hubieren convenido en la cosa objeto del contrato, y en el precio, aunque ni la una ni el otro se hayan entregado.

A los efectos de la Ley núm. 151 de 1937, supra, el evento tributable surgió al hacerse por los cosecheros la entrega del tabaco comprado por las cooperativas. *Central Victoria* v. *Buscaglia, Tes.,* 63 D.P.R. 909; *West India Oil Co. (P.R.)* v. *Sancho Bonet, Tes.,* 54 D.P.R. 732, 108 F. 2d 144, 311 U. S. 20.

---

(5) Véanse, sin embargo, los siguientes casos sosteniendo la validez de cláusulas similares: *Hogue Kellogg Co.* v. *Baker,* 47 Cal.App. 247, 190 Pac. 493; *Turner, Kuhn and Fraser, Inc.* v. *Jones,* 61 Cal.App. 732, 215 Pac. 1033; *Black* v. *Solano Co.,* 299 Pac. 843; *cf. Western Oil and Refining Co.* v. *Venango Oil Corporation,* 16 P. 2d 190.

No habiendo sido la apelada en este caso la primera compradora del tabaco, no venía obligada a pagar el arbitrio impuesto por la Ley núm. 151 de 1937, supra.

*Aunque por otros fundamentos, procede confirmar la sentencia apelada.*

El Juez Asociado Sr. Snyder no intervino.