In the Matter of CLARK PIPE & SUPPLY CO., INC., Debtor.

Claude R. SMITH, As Trustee for the Debtor, Clark Pipe & Supply Co., Inc., Appellee,

v.

ASSOCIATES COMMERCIAL CORP., Appellant.

No. 88–3376.

United States Court of Appeals, Fifth Circuit.

April 25, 1989.

Rex E. Lee, Washington, D.C., Richard W. Bussoff, Linton W. Carney, Jr., Monroe & Lemann, New Orleans, La., for appellant.

Philip K. Jones, Jr., Liskow & Lewis, New Orleans, La., for appellee.

Before POLITZ and JOLLY, Circuit Judges, and HUNTER, District Judge.[*]

E. GRADY JOLLY, Circuit Judge:

In this bankruptcy case we are presented with three issues arising out of the conduct of the bankrupt's lender during the ninety days prior to the bankrupt's filing for protection from creditors. The first is whether the lender improved his position vis-a-vis other creditors during the ninety-day period and thus received a voidable transfer. If so, the second question is whether the lender engaged in inequitable conduct that would justify subordination of the lender's claims to the extent that the conduct harmed other creditors. If so, we must finally determine whether avoiding the transfer and equitable subordination are duplicative or complementary.

[*] District Judge of the Western District of Louisi-

## I

Clark Pipe and Supply Company, Inc., ("Clark") was in the business of buying and selling steel pipe used in the fabrication of offshore drilling platforms. In September 1980, Associates Commercial Corp. ("Associates") and Clark executed various agreements under which Associates would make revolving loans secured by an assignment of accounts receivable and an inventory mortgage. Under the agreements, Clark was required to deposit all collections from the accounts receivable in a bank account belonging to Associates. The amount that Associates would lend was determined by a formula, i.e., a certain percentage of the amount of eligible accounts receivable plus a certain percentage of the cost of inventory. The agreements provided that Associates could reduce the percentage advance rates at any time at its discretion.

When bad times hit the oil fields in late 1981, Clark's business slumped. In February 1982 Associates began reducing the percentage advance rates so that Clark would have just enough cash to pay its direct operating expenses. Clark used the advances to keep its doors open and to sell inventory, the proceeds of which were used to pay off the past advances from Associates. Associates did not expressly dictate to Clark which bills to pay. Neither did it direct Clark not to pay vendors or threaten Clark with a cut-off of advances if it did pay vendors. But Clark had no funds left over from the advances to pay vendors or other creditors whose services were not essential to keeping its doors open.

One of Clark's vendors, going unpaid, initiated foreclosure proceedings in February and seized the pipe it had sold Clark. Another attempted to do so in March. The resulting priority dispute was resolved only in litigation. See Mitsubishi International Corp. v. Clark Pipe & Supply Co., 735 F.2d 160 (5th Cir.1984), and In the Matter of Clark Pipe, Inc. Debtor, 759 F.2d 19 (5th Cir.1985) (Mitsubishi International Co.; Interpipe, Inc.; Nichimen Co., Inc.; and Berg Steel Pipe Corp., all pipe vendors and

ana, sitting by designation.

the Walworth Co., Inc., a valve vendor, had valid vendors' privileges in the goods they had sold Clark that, under Louisiana law, primed Associates' inventory mortgage). When a third unpaid creditor initiated foreclosure proceedings in May, Clark sought protection from creditors by filing for reorganization under Chapter 11 of the Bankruptcy Code.

The case was converted to a Chapter 7 liquidation on August 31, 1982, and a trustee was appointed. In 1983, the trustee brought this adversary proceeding against Clark's lender, Associates. The trustee sought the recovery of alleged preferences and equitable subordination of Associates' claims. Following a one-day trial on August 28, 1986, the bankruptcy court entered judgment on April 10, 1987, and an amended judgment on June 9, 1987. The court required Associates to turn over $370,505 of payments found to be preferential and subordinated Associates' claim. The district court affirmed on May 24, 1988. 87 B.R. 21.

## II

### A.

The first issue before us is whether the bankruptcy court was correct in finding that Clark, by selling its inventory and thereby converting the inventory to accounts receivable that had been assigned to Associates, made a preferential transfer to Associates that should be avoided in accordance with sections 547(b) and (c)(5) of the Bankruptcy Code. It is undisputed that the reduction of pipe to accounts receivable was in effect a transfer of the pipe to Associates. Under section 547(c)(5), however, that transfer cannot be avoided unless it enabled Associates to improve its position vis-a-vis other creditors by reducing its undersecurity at their expense during the ninety-day period between February 5 and May 7.[1]

In order to determine whether Associates improved its position during the ninety-day preference period, we must apply the test we adopted in *Matter of Missionary Baptist Foundation of America, Inc.*, 796 F.2d 752, 760 (5th Cir.1986) (*Missionary Baptist II*):

> The "two-point net improvement" test of Section 547(c)(5) requires ... a computation of (1) the loan balance outstanding ninety days prior to the bankruptcy; (2) the value of the [collateral] on that day; (3) the loan balance outstanding on the day the bankruptcy petition was filed;

1. Section 547(b) and (c)(5) read:
   (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
   (1) to or for the benefit of a creditor;
   (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
   (3) made while the debtor was insolvent;
   (4) made—
   (A) on or within 90 days before the date of the filing of the petition; or
   (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
   (5) that enables such creditor to receive more than such creditor would receive if
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
   (c) The trustee may not avoid under this section a transfer—

   (5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferree caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt on the later of—
   (A)(i) with respect to a transfer to which subsection (b)(4)(A) of this section applies, 90 days before the date of the the filing of the petition; or
   (ii) with respect to a transfer to which subsection (b)(4)(B) of this section applies, one year before the date of the filing of the petition; or
   (B) the date on which new value was first given under the security agreement creating such security interest;
   ....

and (4) the value of the [collateral] on that day.

By comparing the loan balance minus the value of Associates' collateral on February 5 with the loan balance minus the value of Associates' collateral on May 7, it can be determined whether Associates improved its position during the ninety-day period. The loan balances on February 5 and May 7 are not at issue here. The dispute concerns the value to be assigned the collateral on February 5.

Associates argues that in valuing the inventory as of February 5, the bankruptcy and district courts should have employed the going-concern method of valuation rather than the liquidation method. Associates contends that because the district court employed the wrong valuation method, it found a preference where there was none. Associates also argues that because the bankruptcy court failed to give reasons for its choice of valuation method, and the district court merely affirmed the bankruptcy court without discussing the valuation question, we must reverse and remand.

### B.

■ Taking these contentions in reverse order, we consider first whether the record is sufficiently complete to permit review in the absence of precisely articulated reasons for the actions of the bankruptcy court. In *Missionary Baptist II* we remanded, finding the record unreviewable because, in applying section 547(c)(5), the bankruptcy judge had not given specific reasons for his choice of valuation method. 796 F.2d at 761–62. Viewing this record as a whole, however, we conclude that it is adequate for purposes of review. In its Conclusions of Law, the bankruptcy court rejected Associates' argument that going-concern value should be used in determining the value of the collateral on February 5 and explicitly accepted the expert testimony offered by the trustee that liquidation value should be used. That expert testimony contained reasons in support of its conclusion. Thus we conclude that the bankruptcy court adopted the reasoning of the trustee's ex-

pert, and therefore we cannot say that the case must be remanded before we can properly review it on appeal.

### C.

■ Having concluded that the record is reviewable, we must examine the record to determine whether the bankruptcy court adopted the appropriate method of valuing the collateral. The Code does not prescribe any particular method of valuing collateral at the beginning of the preference period in such cases, but instead leaves valuation questions to referees and judges on a case-by-case basis. *See* H.R.Rep. No. 595, 95th Cong. 1st Sess., 216, 356 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6176, 6312. Valuation is a mixed question of law and fact, the factual premises being subject to review on a "clearly erroneous" standard, and the legal conclusions being subject to *de novo* review. *In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir.1986); *Matter of Missionary Baptist Foundation of America*, 712 F.2d 206, 209 (5th Cir.1983) (*Missionary Baptist I*). Since the bankruptcy court's findings of fact are uncontested, we focus on whether the bankruptcy court made a legal error in concluding from its findings of fact that Associates' collateral should be valued on a liquidation, rather than a going-concern, basis at both ends of the preference period. Associates' collateral consisted of inventory and receivables. Since the parties stipulated the value of the accounts receivable, and since there was no dispute about the value of the inventory on May 7, the sole issue was the value of Clark's inventory on February 5.

The bankruptcy court adopted the view of the trustee's expert that Clark was in the process of liquidation throughout the ninety-day period from February 5 to May 7. Thus, for purposes of determining whether Associates improved its position at the expense of other creditors during that period, the liquidation method of valuing the collateral should be employed at both ends of the preference period. Associates contends that the bankruptcy court should have considered evidence that on February

5 Clark could have returned pipe to its vendors and received a credit of one hundred percent of cost. If the bankruptcy court had valued the inventory on February 5 according to what it thus might have brought if returned to the vendor (100% of cost), and valued it on May 7 according to what Clark actually realized in liquidation (40% of cost), Associates argues, the loan balance less the value of the collateral on May 7 would exceed the loan balance less the value of collateral on February 5. Thus, there would have been no improvement of Associates' position during the preference period, and hence no voidable transfer under section 547(c)(5).

In *Missionary Baptist II*, 796 F.2d at 761–62, a case involving valuation of accounts receivable collateral, we said that simply taking the value of the collateral at its "face value" might be inappropriate if face value on the day of bankruptcy "were not or could not in fact be collected in full." We endorsed the commonsense view of at least one scholar that for the purpose of determining whether an improvement in position has occurred, bankruptcy judges should compare apples with apples:

> To determine whether the creditor is in a better position than it would have been had bankruptcy been declared ninety days earlier, the appropriate comparison would seem to be between the proceeds of the [collateral] actually liquidated after bankruptcy and the amount which would have been obtained if the [collateral] ninety days earlier had been liquidated in the same manner.... Because this individualized approach defines "value" in accordance with the method actually chosen to transform the [collateral] to cash, it more accurately measures how much a particular creditor actually improved its eventual position during the ninety days before bankruptcy.

Cohen, *Value Judgments: Accounts Receivable Financing and Voidable Preferences Under the New Bankruptcy Code*, 66 Minn. L.R. 639, 664 (1982) (discussing five alternatives). This view is particularly compelling where, as here, a debtor is not only deemed to be insolvent at the beginning of the preference period under section 547(f), but actually *is* in liquidation at the beginning of the preference period. Based on financial statements accepted by both parties to this litigation, the trustee's expert drew the conclusion, which was accepted as fact by the bankruptcy court, that Clark was already in the process of liquidation as of February 5, 1982. Thus, we hold that the bankruptcy court was correct in valuing the inventory at both ends of the preference period at forty percent of cost, the percentage of cost Clark actually realized in liquidation. It follows that the bankruptcy court correctly determined the existence of a voidable preference and the amount of the preference.

### III

The second issue before us is whether the bankruptcy court was justified in equitably subordinating Associates' claims. The Fifth Circuit has enunciated a three-pronged test to determine whether and to what extent a claim should be equitably subordinated: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *Missionary Baptist I*, 712 F.2d at 212.

### A.

■ The courts have recognized three general categories of conduct as sufficient to satisfy the first prong of the three-part test: (1) fraud, illegality or breach of fiduciary duties; (2) undercapitalization; and (3) a claimant's use of the debtor as a mere instrumentality or alter ego. *Id.*

■ In essence, the bankruptcy court found that once Associates realized Clark's desperate financial condition, Associates asserted total control and used Clark as a mere instrumentality to liquidate Associates' unpaid loans. Moreover, it did so, the trustee argues, to the detriment of the rights of Clark's other creditors.

Associates contends that its control over Clark was far from total. Associates says that it did no more than determine the percentage of advances as expressly permitted in the loan agreement; it never made or dictated decisions as to which creditors were paid. Thus, argues Associates, it never had the "actual, participatory, total control of the debtor" required to make Clark its instrumentality under *Krivo Industrial Supply Co. v. National Distillers & Chemical Corp.*, 483 F.2d 1098, 1105 (5th Cir.1973), *modified factually* 490 F.2d 916 (5th Cir.1974) (elaborated in *Valdes v. Leisure Resource Group, Inc.*, 810 F.2d 1345, 1354 (5th Cir.1987)). If it did not use Clark as an instrumentality or engage in any other type of inequitable conduct under *Missionary Baptist I*, argues Associates, then it cannot be equitably subordinated.

Associates overlooks that the issue in *Krivo* is conceptually distinct from the issue here. In *Krivo*, the issue is whether the court should disregard the corporate form of one corporation entirely and hold another liable for its debts. 483 F.2d at 1102. Courts will "pierce the corporate veil" in this manner where a corporation is so undercapitalized or so dominated by its stockholders or creditors that it is deemed to have no identity separate from theirs. *Id.* at 1102, 1104–07. Where there is no separate identity, the rationale for sparing the owners of the corporation from personal liability for the corporate debts is absent. Piercing the corporate veil is a drastic remedy because a declaration, in effect, that the corporation never existed as an independent entity might have far-reaching and unpredictable results: the shareholders of the corporation might unexpectedly find themselves liable for all the debts of the corporation, thus nullifying the principal attribute of the corporate form, the protection of shareholders from personal liability. This remedy is considered particularly extreme where, as in *Krivo*, the party seeking to pierce the corporate veil on an instrumentality theory is a contract creditor who dealt with the corporation pursuant to a contract made at arms length, because, at least theoretically, the creditor in that situation had an opportunity to investigate the corporation with which it was dealing. In our view, it is because the plaintiff in *Krivo* is just such a creditor that the *Krivo* court adopts such a high standard for finding that a corporation was a mere instrumentality. Courts are more likely to find that one corporation has used another as an instrumentality in aid of a tort creditor who unwillingly and without choice became a creditor of the corporation.

■ In the instant case, the trustee is not asking the court to nullify entirely the independent existence of the debtor and hold Associates responsible for its debts. He is asking the court only to nullify the results of specific inequitable conduct by a creditor during a discrete phase of the corporation's life, on the ground that the creditor temporarily asserted control over the corporation and used that control to benefit itself and injure other creditors who had no reason to believe that their relationships with Clark would be interfered with or impaired by Associates. Hence, the situation of the injured creditors is more akin to that of the unwilling tort creditor than to the contract creditor in *Krivo*. At least one pair of commentators has accordingly recognized that the level of control required to pierce the corporate veil based on an instrumentality theory is not necessarily the level of control required for equitable subordination based on an instrumentality theory.

> Since the result of application of the instrumentality rule is to hold the party in control liable for debts of an unknown magnitude, a greater level of control may be required than in equitable subordination, in which the known claim of the party in control is being denied a right to share on an equal basis in the debtor's assets. The level of risk of loss to the party in control is better defined in equitable subordination and therefore may require a lower threshold of conduct.

DeNatale and Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus.Law., 417, 443 (1985). Because this case calls for application of the instrumentality doctrine

in a setting analytically different from that in *Krivo*, we look to equitable subordination cases for the applicable law.

The case most directly on point is *In re American Lumber Co.*, 5 B.R. 470 (D.Minn.1980). In that case the bank was a formerly unsecured creditor that took a security interest in the inventory and accounts receivable. It began liquidation of the debtor by commencing a foreclosure on its security interests. The debtor's employees were all fired and a new skeleton crew was subsequently hired. The bank instituted a depository system into which all the debtor's collections were deposited and it determined who would be paid. The bank refused to pay general unsecured creditors or sales taxes while seeing to it that accounts receivable were enhanced.

In determining whether the bank's conduct satisfied the first prong of the *Missionary Baptist I* test, the court said:

> [I]t was the Bank's use of its control over [the debtor's] operations in a manner detrimental to the unsecured creditors which constitutes the inequitable conduct. The purposeful exercise of that control to implement its plan is amply demonstrated, not merely by [an attorney's] comments as to the plan he had to disadvantage the general creditors by taking security interests in inventory and equipment, but also by the Bank's actions in following through with conduct designed to obtain from the Bank a greater percentage of the debt owed to it by [the debtor] than owed to other general creditors.

We agree with the district court and the bankruptcy court that although Associates' control of the debtor's liquidation may have been less overt than the bank's in *In re American Lumber Co.*, it was no less complete. Moreover, the evidence is overwhelming that Associates used its control in a manner detrimental to the unsecured creditors. As a *de facto* insider, *see In re Joe Edward Henderson and Sally Buher Henderson*, 96 B.R. 820 (Bankr.E.D.Tenn. 1989); *De Rosa v. Buildex, Inc. (In re F &*

*S Central Mfg.*), 53 B.R. 842, 848 (Bankr.E. D.N.Y.1985), Associates knew that Clark was headed for bankruptcy and sought to defer it as long as possible in order to recoup its investment at the expense of the suppliers. Knowing that Associates would be grossly undersecured if Clark went under immediately, Fred Slice, Associates' loan officer responsible for the Clark account, devised a plan that would allow Clark to keep its doors open to generate accounts receivable by liquidating as much inventory as possible. Slice testified as to what he had in mind:

> I just kept on trying to get out of the loan, you know. My attitude was bankruptcy is inevitable. I want to get in the best position I can prior to the bankruptcy; i.e., I want to get the absolute amount of dollars as low as I can by hook or crook. And, you know, worry preferences and all of that at a later date which, you know, I was aware there was a danger, but I don't know all of the legal ramifications.
>
> . . . .
>
> . . . As long as they were selling my pipe, collecting my receivables and turning my inventory from something that was highly illiquid into something more liquid, yeah. As long as I could—it was in my interest for Clark to keep operating. And, yeah, I personally would have preferred that to bankruptcy.
>
> But it was inevitable. It was going to happen in my opinion. I was trying to get in—the ship was going down. I just wanted to get myself on a life raft with a few provisions so we could cut our losses.

Associates used its loan agreement and advances not merely to protect its investment, as it claims, but to leverage its recovery at the expense of other creditors. Because of Associates' policy, suppliers were forced to bear the cost of Associates' liquidation of Clark. These creditors, including such disparate entities as newspapers, trucking companies, building supply companies, computer manufacturers, utilities, taxing authorities, and soft drink bottlers, as well as inventory vendors, numbered

some two-hundred eighty altogether. The unfairness to inventory vendors was especially egregious. Every time Clark sold pipe, Associates improved its position to the detriment of the vendor of that pipe. While the pipe remained in inventory, the vendor's privilege, under Louisiana state law, trumped Associates' security interest in the pipe. The moment the pipe was sold, however, the vendor lost his privilege and Associates took priority by virtue of its security interest in receivables. Thus, Associates' strategy was apparently to convert inventory into receivables as fast as possible without alerting the vendors to what was happening. Associates adjusted the formula for advances so as to preclude Clark from making payments to pipe vendors or to trade creditors. Associates reduced advances so that Clark received only enough to keep selling its inventory; any income from the sales was sent directly to Associates in Dallas. Thus, Associates' reduction of advances forced Clark to defer payments to its vendors and trade creditors, sell inventory out from under the vendors' privileges, and send the cash to Associates. Associates' intent is demonstrated by the following testimony:

> If he [the comptroller of Clark] had had the availability [of funds to pay a vendor or other trade creditor] that particular day, I would have said, "Are you sure you've got that much availability, Jim," because he shouldn't have that much. The way I had structured it, he wouldn't have any money to pay his suppliers.
>
> . . . .
>
> But you know, the possibility that—this is all hypothetical. I had it structured so that there was no—there was barely enough money—there was enough money, if I did it right, enough money to keep the doors open. Clark could continue to operate, sell the inventory, turn it into receivables, collect the cash, transfer that cash to me, and reduce my loans.
>
> And, if he had ever had availability for other things, that meant I had done something wrong, and I would have been surprised. To ask me what I would have done is purely hypothetical I don't think

it would happen. I think it's so unrealistic, I don't know.

Another indication that Associates acted inequitably was that at one point Associates advised Clark to remove the vendors' identification numbers and decals from the pipe in its inventory. The court reasonably inferred that Associates' purpose was to frustrate the efforts of vendors to identify and seize the pipe they had sold to Clark in exercise of their vendors' privileges.

In sum, Associates had both a purpose and a plan to maximize its own recovery, knowing that doing so would impair the rights of Clark's other creditors. It used its loan agreement with Clark to dominate Clark and to execute its plan during the ninety days before Clark filed for Chapter 11 protection. Thus, the bankruptcy court and the district court correctly concluded that Clark was an instrumentality of Associates for the limited purpose of equitable subordination. Moreover, they correctly held that Associates used that control to engage in the type of overreaching and spoliation to the detriment of the rights of fellow creditors that amounts to inequitable conduct. *In re Prima,* 98 F.2d 952 (7th Cir.1938).

### B.

■ The second prong of the three-pronged test is the requirement that the inequitable conduct must have resulted in injury to the creditors of the bankrupt or have conferred an unfair advantage on the claimant. The bankruptcy court in its conclusions of law held that the creditors of Clark were injured by Associates' action in two ways: first, the costs of liquidating collateral for Associates' benefit were shifted onto unsecured creditors who advanced credit to Clark from February 5 to May 7, 1982, but were never paid before Clark went into bankruptcy; and second, vendors with vendors' privileges under Louisiana law lost their priority rights in the inventory when it passed out of Clark's hands.

Associates argues that Clark's creditors suffered no harm as a result of Associates' conduct. Any harm to vendors caused by

the loss of an opportunity to assert their vendors' privileges resulted, Associates contends, not from Associates' actions but from the business decisions of the creditors not to foreclose on their liens. We disagree.

Although it is true that the vendors did not foreclose on their liens for business reasons, they did not have the benefit of Associates' inside knowledge. Associates knew of Clark's desperate condition and on the basis of that knowledge took steps to liquidate the inventory. It is certainly reasonable to assume that had the vendors known before the pipe was sold that Clark would not be able to pay them for the pipe because of Associates' financing arrangements and control of Clark, they would have exercised their vendors' privileges in order to protect their interests. Thus, the bankruptcy and district courts were correct to conclude that Associates' conduct injured the vendors. Moreover, we agree with the bankruptcy court that not just the vendors but all the unsecured creditors were unfairly injured by the shifting of the costs of liquidation.

### C.

■ The trustee insists that the third prong was also met since subordination in this case effectuates the policy of the Bankruptcy Code, which is to provide for the equal distribution of assets among creditors. *Matter of Mobile Steel Co.*, 563 F.2d 692, 698 (5th Cir.1977). Associates contends that equitable subordination of its claim would not be consistent with the provisions of the Bankruptcy Code, since the Code nowhere says that a creditor may not protect his investment in accordance with the security and loan agreements.

If Associates had taken reasonable steps only to protect its legitimate rights in the collateral, we could agree. As it was, however, Associates took matters into its own hands and through manipulation of Clark assured that it received special treatment at the expense of the rights of other creditors. The *American Lumber* court came close to capturing the driving force of this case when it said, "What the [lender] did

was not an attempt to save [the debtor] from failure or even to legitimately cover its own losses. It sought to perpetrate a fraud upon the general unsecured creditors of the [debtor]. This kind of conduct cannot be allowed to prevail." *In re American Lumber Co.*, 5 B.R. at 478–79.

### IV

■ The final issue is whether, by setting aside the preference and equitably subordinating Associates' claim to the claims of the other creditors, the bankruptcy court has awarded duplicate remedies. We think not.

By avoiding the preferential transfer to Associates, the bankruptcy court returned to the trustee the amount of money by which Associates had improved its position at the expense of the rights of other creditors during the ninety days prior to bankruptcy. This remedy, however, was incomplete. If Clark's creditors were allowed to line up in order of priority on May 7, 1982, the date on which Clark filed for bankruptcy, Associates arguably would be first in line to reclaim the money which was generated by accounts receivable, since Associates had priority on all accounts receivable. Thus, if the bankruptcy court had avoided the preference and done no more, Associates might have succeeded ultimately in its design of leveraging its recovery at the expense of other creditors.

In order to afford a complete remedy and guarantee a fair division of assets, the bankruptcy court had to prevent Associates from reclaiming its preference, at least to the extent that its improvement in position resulted from Associates' inequitable conduct. Equitable subordination is a tool to be used in just such a situation. Its purpose is "to prevent the consummation of a course of conduct by [a] claimant which ... would be fraudulent or otherwise inequitable," *Heiser v. Woodruff*, 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970, 976 (1946); to "undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *In re Kansas City Journal–Post*

*Co.*, 144 F.2d 791, 800 (8th Cir.1944). Here, the court was correct to hold that Associates' claim must be subordinated to the extent that Associates, by effectively continuing the business in order to improve its undersecured position, harmed Clark's unsecured creditors. Only by employing both remedies in concert could the bankruptcy court assure genuine relief to Clark's other creditors.

For the foregoing reasons, the judgment of the district court is affirmed, and the case is remanded for such further proceedings consistent with this opinion as may be necessary.

AFFIRMED.